## CITY OF SHAWNEE v. CHEEK.

No. 2841.    Opinion Filed December 23, 1913.

(137 Pac. 724.)

1.  **NEGLIGENCE—Landowner—Duty to Trespasser.**  A landowner owes a trespasser a duty, in respect to safety from dangerous artificial condition of premises, not to injure him intentionally or wantonly.

2.  **MUNICIPAL CORPORATIONS** — Negligence — Dangerous Premises—Actionable Negligence—Matters Considered—''Wantonness.'' A mere omission, although superficially characterized by mere thoughtlessness or heedlessness, but, in its deeper explanation, involving a reckless disregard for the safety of merely technical and reasonably anticipated trespassers, such as children of tender years, especially if unconscious trespassers, in respect to obviously and seriously dangerous artificial condition of premises, may amount to wantonness in a landowner; but the attractiveness and accessibility of the place or thing involving such danger and the probability of such trespassers, the gravity of the danger in such condition, the length of time such condition has existed, the smallness of cost and of deprivation of beneficial use involved in eliminating same, and the reasonableness of the inference that the landowner, as a person of ordinary sensibilities and prudence, knew or should have known of, and under all the facts and circumstances in the case should have eliminated such danger, are proper considerations in determining whether there was such reckless disregard for the safety of such trespassers.

3.  **DEATH—Negligence—Contributory Negligence—Infant Trespasser.**  A child under seven years of age, or in the absence of evidence of capacity, between seven and fourteen years of age, is presumed to be incapable of guilt of more than technical trespass, as affecting question of duty of owner in respect to dangerous condition of premises, and the character of the trespass may be a circumstance to be considered by the jury in ascertaining whether there is contributory negligence.

4.  **SAME—Right of Action—Nature of Right.**  Section 4313, St. Okla. 1893 (section 5281, Rev. Laws 1910), does not operate as a continuance of any right of action which the injured person would have had but for his death, but confers upon the beneficiary thereof a property right in the pecuniary value to him of the life of his decedent, and gives him a new or independent cause of action for the pecuniary loss he has sustained by reason of such death.

5.  **SAME—Survival.**  A cause of action arising under section 4313, St. Okla. 1893 (section 5281, Rev. Laws 1910), has the quality

of survivability, is not extinguished by the death of the beneficiary therein, and may be revived and prosecuted in the name of his administratrix.

6. **MUNICIPAL CORPORATIONS—Dangerous Premises—Injury to Trespasser—Petition—Sufficiency.** A petition which does not allege facts from which a reckless disregard for the safety of reasonably anticipated technical, if not unconscious, trespassers, amounting to wantonness appears as a legal conclusion, nor the ultimate fact of reckless disregard for the safety of such trespassers amounting to wantonness, is not sufficient, as against a demurrer, to warrant a recovery of damages for death resulting to such trespasser from dangerous artificial condition of defendant's premises.

(Syllabus by Thacker, C.)

*Error from District Court, Pottawatomie County;*
*Chas. B. Wilson, Jr., Judge.*

Action by Fannie W. Cheek, administratrix, against the City of Shawnee. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

*E. E. Hood,* City Atty., *W. M. Engart,* Asst. City Atty., and *W. T. Williams,* for plaintiff in error.

*Blakeney & Maxey,* for defendant in error.

Opinion by THACKER, C. The plaintiff in error will be designated as defendant, and defendant in error as plaintiff, in accord with their respective titles in the trial court.

About May 24, 1908, defendant owned and possessed, within its corporate limits, a brick pumphouse, with three rooms, in one of which there was a pump pit about eleven feet deep, and covering practically the entire floor space of the room, except a walk way about ten feet wide on one side. This pumphouse was on an unbuilt-up and little used portion of a public street within the corporate limits of defendant, and was in a valley about 75 or 100 yards, according to one witness, or 350 or 440 yards, according to other witnesses, south from the south end of the built-up and more traveled portion of this street, which built-up and more traveled portion of the street extends downward, and ends on the south side of a hill north of the valley. About 75 or 80 yards south of the pumphouse was the channel of the North Canadian

river, with which the pumphouse pit was connected by a pipe. About 200 yards from the pumphouse was a race track, and within 60 or 70 feet of the pumphouse were the stables connected, in use or purpose, with the race track. The defendant had used the pumphouse in connection with its system of waterworks; but three or four years before the date mentioned had taken its pump and pumping equipment away from the pit and building, and had abandoned use of the same because of the flooding of the pump pit through its said pipe connection on the occasion of a rise in the river. The pipe from the river entered the pump pit about twelve or eighteen inches above its bottom, which it appears was above the ordinary level of the water in the river; but plaintiff, in her testimony, mentioned three occasions on which the pump pit had been flooded by rises from the river. After defendant abandoned the pumphouse, it was, with the knowledge and consent of a member of defendant's council, occasionally used by parties having animals in the race track stables for storage of hay; but on May 24, 1908, when, as a result of a rise in the river commencing about two days before, there was about nine feet of water in the pump pit, there was no hay in the pumphouse except a remnant scattered about over the floor and on the surface of the water, which hay on the water had been raised, by the rising of the water, from the bottom of the pump pit. The defendant had made no other use of the premises for three or four years. The glass, if not the sash, had disappeared from the windows, the doors had fallen into a dilapidated condition, both doors and windows were open, and such had been the condition during the greater portion of the time of defendant's abandonment of its use of the pumphouse. James Cheek, the original plaintiff, and Fannie W. Cheek, in whose name, as administratrix, the action was revived, on May 24, 1908, resided with their family, outside of defendant's corporate limits, about 150 yards from the pumphouse, and their children, as well as other children in that vicinity, played about the pumphouse during the time of its abandonment. The plaintiff's children also hunted eggs in the hay in the pumphouse; but plaintiff forbade her children playing about the same. The evidence does not show that defendant had ac-

City of Shawnee v. Cheek.

tual knowledge of such use of its premises by children, nor actual knowledge of the coat of hay on the surface of the water, nor of the depth or fact of water in the pump pit at the time of the accident.   On May 24, 1908, the original plaintiff, with Thompkins Cheek, the nine-year-old son of the two successive plaintiffs, and an older son, had occasion to be, and were, near the pumphouse; but the father and older boy went a short distance away in a boat, leaving Thompkins Cheek to watch some hogs near the pumphouse, and, when the father and older boy, soon after, returned, Thompkins Cheek could not be found.   In the afternoon of the same day the body of Thompkins Cheek was found drowned on the bottom of the pump pit.   At that time the surface of the water in the pit was practically covered with hay that was dry on top, although at places the hay was very thin in its covering, and, by close observation, the water could not only be seen through the hay at places, but there were open spaces from the size of a man's hand to a foot or more square where the same could be seen.   It appears inferentially that Thompkins Cheek, for some unknown purpose, although probably to gratify an instinctive curiosity or desire to re-explore the silent chambers of the deserted building, and possibly lounge upon the hay he thought to find therein, or to search for hens' nests, or to gratify some other boyish impulse, had entered the pumphouse through an open door, had stepped upon the dry hay, apparently, to his view, covering the surface of the water in the pit, without knowledge of there being water in the same, and, the surface of the water being about two feet below the top of the pit, had been unable to extricate himself.   The evidence shows he had been an industrious boy, and helped his parents, not only by work in the field, but by doing chores about the house, and his father, who died about ten months later, was 61 years of age when he was drowned.

This action was begun by petition filed August 6, 1908; but no. trial was had until November 11, 1911, when a verdict for $2,000 was returned for plaintiff.

The case presents the vexed question of the liability of a landowner for personal injuries and death resulting from a child

trespasser's contact with a dangerous condition of the premises.

In 1841 Lord Denman, C. J., in *Lynch v. Naudain*, 1 Q. B. 29, sustained a verdict for an injury upon a plaintiff, under seven years of age, who, with several other children, were playing with defendant's horse and cart in a public street, where same had been left unattended for half an hour, when another boy, by leading, caused the horse to move, and plaintiff, falling from the shaft, was run over by a wheel of the cart, and suffered a fractured leg.

That appears to be the first case in which an owner of property, without actual intent to injure, or actually setting in motion a force, or setting a trap, from which injury resulted, had been held liable for personal injuries caused by trespasser's contact with a dangerous condition of his property, not aside from and so near a public highway as to be dangerous to travelers getting off the same, although other cases are there cited as if supporting the conclusions there reached.

It appears that there was no extended discussion of the doctrine announced in that case until after the decision of the Turntable case (*Stout v. City & P. R. Co.*, Fed. Cas. 13,504, affirmed in 17 Wall. 657, 21 L. Ed. 745) in 1873; but, with the great volume of litigation involving the same that has followed, a war of conflicting ideas has since raged with unabated vigor about this doctrine. The doctrine, apparently without good reason, is known as the "attractive nuisance" doctrine.

The cases sustaining the doctrine, or allowing a recovery, have not only based their conclusions in some instances upon somewhat different grounds, but are not agreed as to the limitations which should be placed upon the doctrine, and this has been urged by some of the critics as evidence of lack of solidity in any ground whatever for the doctrine.

In answer to the argument that the special attractiveness of the thing or place was an implied or constructive invitation to children, it has been said that the condition or use of land by its owner is not intended as such invitation, that the distinction between invitation and temptation is ignored by such argument, that there are but few things or places not attractive to children, and that it is difficult, if not impossible, to find and mark out, so

that landowners may be able to see and know, the boundary line between the things or places that are and the things and places that are not so attractive as to constitute such invitation and render them liable for injuries to trespassing children coming in contact with such things or places; but the duty to use ordinary care for the safety for one by invitation upon the premises is indisputable, and most of the cases in which there is any attempt to find the principle upon which recovery is allowed do so on that of such invitation.

In answer to the argument that the landowner may be held liable upon the ground of an implied intent to injure, it has been said that it is absurd to imply such intent where it is clear that it does not in fact exist; but, of course, the duty and the liability for negligence in a breach of the duty to abstain from intentionally injuring even a trespasser, unless in the lawful exercise of the right of defense or expulsion, is indisputable.

In answer to the argument that the maxim of *"sic utere tuo ut alienum non laedas"* (which, literally translated, means. "enjoy your own property in such a manner as to not injure that of another person") requires the landowner to exercise care to make his premises so safe as to avoid injury to trespassing children who may come in contact with a dangerous condition of the same, it has been said that the true legal meaning of this maxim is, "so use your own property as not to injure the rights of another," and that, as a trespasser has no right to be upon the landowner's premises, this maxim is inapplicable, and, although we express no opinion on this point, in *Walker v. Potomac, F. & P. R. Co.* (*Pannill v. Potomac, F. & P. R. Co.*) 105 Va. 226, 53 S. E. 113, 4 L. R. A. (N. S.) 80, 115 Am. St. Rep. 871, 8 Ann. Cas. 862, the court said there might be more, but there was one conclusive answer to this argument, in that the maxim referred only to acts of the landowner,. the effect of which extended beyond the limits of his property.

In the well-considered case of *Bottum's Adm'r v. Hawks,* 84 Vt. 370, 79 Atl. 858, 35 L. R. A. (N. S.) 440, Ann. Cas. 1913A, 1026, decided March 8, 1911, the doctrine is condemned, and that court's conception of the status and tendency of judicial opinion,

both in England and this country, on the subject seems worthy of statement here, and appears in the following extract from the opinion:

"As said by (now) Mr. Justice Lurton, in *Folton v. Aubrey,* 74 Fed. 350, 43 U. S. App. 278, 20 C. C. A. 436. 'It seems to us that many of the American cases which we have cited fail to draw the proper distinction between the liability of an owner of premises to persons who sustain injuries as a result of the mere condition of the premises and those who come to harm by reason of the subsequent conduct of the licensor inconsistent with the safety of persons permitted to go upon the premises and who he was bound to anticipate might avail themselves of his license. This seems to be sharply emphasized in the case of *Corby v. Hill* (4 C. B. N. S. 556, 93 E. C. L. 556), and is a distinction which should not be overlooked. * * *' Some uncertainty, however, seems to have existed in England as to the standing of the case, and much inconsistency appears in the English cases since decided (a review of which is found in *Friedman v. Snare, etc., Co.,* 71 N. J. Law, 605, 61 Atl. 401, 70 L. R. A. 147, 108 Am. St. Rep. 764, 2 Ann. Cas. 497); but all doubt is now set at rest by the recent case of *Cooke v. Midland G. W. R. Co.* [1909] A. C. 229, 5 Ann. Cas. 557, wherein the Lynch case is expressly approved, and its doctrine applied to a turntable case. * * * Notwithstanding the unstable foundation upon which the Stout case stands, it was expressly approved and adhered to in *Union Pac. R. Co. v. McDonald,* 152 U. S. 262, 434, 14 Sup. Ct. 619, 38 L. Ed. 434, and must, doubtless, be accepted as the law of that court. * * * It must be admitted that a majority of the cases adopt the rule of the Stout case. The list includes *Alabama G. S. R. Co. v. Crocker,* 131 Ala. 584, 31 South. 561; *Barrett v. Southern Pac. Co.,* 91 Cal. 296, 27 Pac. 666, 25 Am. St. Rep. 186; *Ferguson v. Columbus, etc., R. Co.,* 77 Ga. 102; *Chicago, etc., R. Co. v. Fox,* 38 Ind. App. 268, 70 N. E. 81; *Edgington v. Burlington, etc., R. Co.,* 116 Iowa, 410, 90 N. W. 95, 57 L. R. A. 561; *Kansas Cent. R. Co. v. Fitzsimmons,* 22 Kan. 686, 31 Am. Rep. 203; *Brown v. Chesapeake, etc., R. Co.,* 135 Ky. 798, 123 S. W. 298, 25 L. R. A. (N. S.) 717; *Keffe v. Milwaukee, etc., R. Co.,* 21 Minn. 207, 18 Am. Rep. 393; *Nagel v. Missouri Pac. R. Co.,* 75 Mo. 653, 42 Am. Rep. 418; *Chicago, etc., R. Co. v. Krayenbuhl,* 65 Neb. 889, 91 N. W. 880, 59 L. R. A. 920; *Bridger v. Asheville, etc., R. Co.,* 25 S. C. 24; *Ilwaco, R., etc., Co. v. Headrick,* 1 Wash. 446, 25 Pac. 335, 22 Am. St. Rep. 169; *Ft. Worth, etc., R. Co. v. Robertson* (Tex.) 16 S. W. 1093, 14 L. R. A. 781.

On the other hand, the rule is utterly rejected in *Wilmot v. McPadden*, 79 Conn. 367, 65 Atl. 157, 19 L. R. A. (N. S.) 1101; *Daniels v. New York, etc., R. Co.*, 154 Mass. 349, 28 N. E. 283, 13 L. R. A. 248, 26 Am. St. Rep. 253; *Ryan v. Towar*, 128 Mich. 463, 87 N. W. 644, 55 L. R. A. 310, 92 Am. St. Rep. 481; *Frost v. Eastern R. Co.*, 64 N. H. 220, 9 Atl. 790, 10 Am. St. Rep. 396; *Delaware, etc., R. Co. v. Reich*, 61 N. J. Law, 635, 40 Atl. 682, 41 L. R. A. 831, 68 Am. St. Rep. 727; *Walsh v. Fitchburgh R. Co.*, 145 N. Y. 301, 39 N. E. 1068, 27 L. R. A. 724, 45 Am. St. Rep. 615; *Wheeling, etc., R. Co. v. Harvey*, 77 Ohio St. 235, 83 N. E. 66, 19 L. R. A. (N. S.) 1136, 122 Am. St. Rep. 503, 11 Ann. Cas. 981; *Thompson v. Baltimore, etc., R. Co.*, 218 Pa. 444, 67 Atl. 768, 19 L. R. A. (N. S.) 1162, 120 Am. St. Rep. 897, 11 Ann. Cas. 894; *Paolino v. McKendall*, 24 R. I. 432, 53 Atl. 268, 60 L. R. A. 133, 96 Am. St. Rep. 736; *Walker v. Potomac, etc., R. Co.*, 105 Va. 226, 53 S. E. 113, 4 L. R. A. (N. S.) 80, 115 Am. St. Rep. 871 [8 Ann. Cas. 862]; *Ritz v. Wheeling*, 45 W. Va. 262, 31 S. E. 993, 43 L. R. A. 148. That there is a strong tendency to limit rather than extend the doctrine is admitted on all sides. This tendency is sufficiently shown by the following cases from the states wherein the turntable doctrine is approved: [*Savannah, F. & W. R. Co. v. Beavers*, 113 Ga. 398] 39 S. E. 82, 54 L. R. A. 314, which was the case of a five year old boy drowned in a pool formed in an excavation on the premises of the plaintiff in error; *Stendal v. Boyd*, 73 Minn. 53, 75 N. W. 735, 42 L. R. A. 288, 72 Am. St. Rep. 597, which was the case of a boy, not quite five years old, drowned in a quarry hole on the defendant's premises; *Moran v. Pullman Palace Car Co.*, 134 Mo. 641, 36 S. W. 659, 33 L. R. A. 755, 56 Am. St. Rep. 543, which was the case of a nine year old boy drowned in a quarry hole; *Dobbins v. Missouri, etc., R. Co.*, 91 Tex. 60, 41 S. W. 62, 38 L. R. A. 573, 66 Am. St. Rep. 856, which was the case of a three year old child drowned in a pool of water on defendant's right of way; *Richards v. Connell*, 45 Neb. 467, 63 N. W. 915, which was the case of a ten year old boy drowned in a pond allowed to form on the defendant's premises; *Mayfield Water, etc., Co. v. Webb*, 129 Ky. 395, 111 S. W. 712, 18 L. R. A. (N. S.) 179, 130 Am. St. Rep. 469, which was the case of an eleven year old boy killed while playing on a telephone guy wire; *Harris v. Cowles*, 38 Wash. 331, 80 Pac. 537, 107 Am. St. Rep. 847, which was the case of a child of tender years injured while playing with a revolving door; *Peters v. Bowman*, 115 Cal. 345, 47 Pac. 113, 598, 56 Am. St. Rep. 106, which was the case of an eleven year old boy drowned in a pond of surface water which

was allowed to stand on defendant's lot.  Other cases like *Brown v. Salt Lake City*, 33 Utah, 222, 93 Pac. 570, 14 L. R. A. (N. S.) 619, 126 Am. St. Rep. 828, 14 Ann. Cas. 1004; *Pekin v. McMahon*, 154 Ill. 141, 39 N. E. 484, 27 L. R. A. 206, 45 Am. St. Rep. 114; *Indianapolis Water Co. v. Harold* (Ind. App.) 79 N. E. 542; and *Price v. Atchison Water Co.*, 58 Kan. 551, 50 Pac. 450, 62 Am. St. Rep. 625—with much more consistency, apply the doctrine to the cases of open conduits, ditches, and water holes, and hold the landowner liable."

It appears that Illinois (see *St. Louis, etc., R. Co. v. Bell*, 81 Ill. 76, 25 Am. Rep. 269, and *Pekin v. McMahon, supra*) and Tennessee (see *East Tenn. etc., Ry. Co. v. Cargille*, 105 Tenn. 628, 59 S. W. 141, and *Bates v. Nashville, etc., R. Co.*, 90 Tenn. 36, 15 S. W. 1069, 25 Am. St. Rep. 665) should also be included in the first foregoing enumeration of states favoring the doctrine.

In *Uthermohlen v. Bogg's Run Co.*, 50 W. Va. 457, 40 S. E. 410, 55 L. R. A. 911, 88 Am. St. Rep. 884, the court said that the doctrine of the turntable cases shifted the duty of watchfulness and care from the shoulders of parents, where the Creator had placed it, to the shoulders of the landowners using their property to make a living, and thus materially detracted from the full ownership of property, sacred under the Constitution; but we only refer to that statement as an extreme view.

In *Ryan v. Towar*, 128 Mich. 463, 87 N. W. 644, 55 L. R. A.. 310, 92 Am. St. Rep. 481, the doctrine is also condemned, and the court, in criticism, referred to an application thereof in a Kansas case, and said:

"Here we have the doctrine of the turntable cases carried to its natural and logical result.  We have only to add that every man who leaves a wheelbarrow, or a lawnmower, or a spade upon his lawn, a rake, with its sharp teeth pointed upward, upon the ground, or leaning against the fence, a bed of mortar prepared for use in his new house, a wagon in his barnyard, upon which children may climb, and from which they may fall, or who turns in his lot a kicking horse or cow with calf, does so at the risk of having the question of his negligence left to a sympathetic jury.  How far does the rule go?  Must his barn door, and the usual apertures through which the accumulations of the stable are thrown, be kept locked and fastened, lest twelve year old boys get in and be hurt by the animals, or by climbing into the

haymow, and falling from beams? May a man keep a ladder, or a grindstone, or a scythe, or a plow, or a reaper, without danger of being called upon to reward trespassing children, whose parents owe and may be presumed to perform the duty of restraint? Does the new rule go still further, and make it necessary for a man to fence his gravel pit or quarry? And, if so, will an ordinary fence do, in view of the known propensity and ability of boys to climb fences? Can a man nowadays safely own a small . lake or fish pond upon his land? Such is the evolution of the law less than 30 years after the decision of *Railroad Co. v. Stout*, 17 Wall. 657 [21 L. Ed. 745], when, with due deference, we think some of the courts left the solid ground of the rule that trespassers cannot recover for injuries received, and due merely to negligence of the persons trespassed upon."

In the same case it is further said in the opinion:

"That a landowner is under no obligation to use care to protect a trespasser is a broad, and, until recently, undisputed, rule, without exception; liability for injuries sustained by such being limited to cases of intentional or wanton injuries. The rule, with this limitation, is sustained today by the great weight of authority. It is contended by some lawwriters, and has been held in some cases, that an exception exists in favor of children of tender years. The varying reasons given should lead us to doubt the solidity of the foundations upon which these cases rest, especially when none of the reasons are of recognized authority. The law has never before denied the liability of children for trespass because of tender years. On the contrary, it was intimated in *Mangan v. Attorton*, L. R. 1 Exch. 239, that a four year old boy was a trespasser, under the circumstances of that case, and there are numerous cases cited in this opinion where liability is denied upon that, and no other, ground. The assertion that the weight of authority supports the plaintiff's contention in this case seems to us incorrect. It may be true that, in cases involving turntables, a majority of the cases, which are necessarily few, have followed the case of *Railroad Co. v. Stout*, 17 Wall. 657 [21 L. Ed. 745], but there should be a legal principle underlying the rule laid down in that case, and that principle has been assiduously sought for by some of the courts, without success, as we have seen."

In the case of *Wheeling L. E. Co. v. Harvey, supra*, decided in 1907, where much of the case law upon the doctrine is very ably reviewed, and the doctrine condemned by the Ohio court,

in speaking of the opinion of Judge Hooker in *Ryan v. Towar, supra,* it is said:

"Of the case of *Powers v. Harlow,* 53 Mich. 507, 19 N. W. 257, 51 Am. Rep. 154, in which the opinion is by Judge Cooley, and which is quoted from at some length in *Union P. R. Co. v. McDonald,* 152 U. S. 262, 14 Sup. Ct. 619, 38 L. Ed. 434, as approving the turntable doctrine, he says: ' 'Clearly this does not adopt the rule of *Sioux City & P. R. Co. v. Stout.'* "

In *Powers v. Harlow, supra,* Judge Cooley said: "A man of ordinary prudence, if told that so dangerous an article was so carelessly stored, might well have deemed the statement incredible"—and, although it is not expressly so stated in the opinion, the act for which a recovery was there allowed appears to have been wanton in its reckless indifference to the safety of others.

In the case of *Ritz v. Wheeling,* 45 W. Va. 262, 31 S. E. 993, 43 L. R. A. 148, the court, in speaking of the original turntable case, said:

"[It] if carried to the length to which it is sought to be carried, would exact of every property owner the utmost watchfulness, vigilance, and expenditure to guard against hurt to children, else he would be every moment in danger of ruinous damages. It attacks the right of free use of one's property in lawful business. A railroad liable because it happened to leave a turntable unblocked, as turntables often are, on its own track—a necessary appliance in lawful business! Ought a farmer to be liable for failing to put a picket fence around his pond necessary for his cattle? If he does not, some little boy will climb the fence into the farmer's field, drown in the pond, and the farmer is sued on the same principle. The dam that contains water to turn the mill wheel, having a path around it shaded with willows, is very alluring to the child and the man. Must the miller inclose it? The canal, with its towpath and frogs, is very attractive to the little boy or girl, and dangerous, too. If a child drown in it, is the company liable? How many more instances of things useful in lawful business, and withal very attractive to children, and very dangerous, might be put? And the rule contended for says that, if the thing causing the injury be attractive or seductive, the liability attends it. Now many things are, or may be, so to children? 'A child's will is the wind's will.' Almost everything will attract some child. The pretty horse, or the bright red mowing machine, or the pond in the farmer's field, the millpond, the canal, the railroad cars, the moving carriage in the street,

electric works, and infinite other things attract the child, as well as the city's reservoir. To what things is the rule to be limited? And where will not the curiosity, the thoughtlessness, and the agile feet of the truant boy carry him? He climbs into the high barn and the high cherry tree. Are they, too, to be watched and guarded against him?"

The authorities are, we believe, agreed that a landowner is in duty bound to abstain from intentionally harming a trespasser, unless in the lawful exercise of the right of defense or expulsion, and, in a very able, if not entirely satisfactory, criticism of the doctrine, to which there has been complimentary reference by several courts, Judge Jeremiah Smith, in an article published in 11 Harvard Law Review, 349, says:

"He is also, by the better view, under a duty to avoid harming the trespasser by negligent acts which result in actively bringing force to bear upon the trespasser. It is a mooted question whether this duty is confined to cases where the presence of the trespasser is known to the landowner. Some authorities hold that the owner may, in special circumstances, be under a duty to use care to ascertain whether trespassers are present before he sets in motion a force which would be likely to endanger any such person if within reach. But the alleged duty, if admitted, is material only when it is sought to make the landowner liable for actively bringing force to bear upon the trespasser." ·

In the Smith article, *supra,* it is further said:

"Upon the crucial inquiry whether the law should impose such a duty upon the landowner, there are considerations of undoubted weight to be urged in favor of either view. A balance must be struck between the benefit to the community of the unfettered freedom of owners to make a beneficial use of their land and the harm which may be done in particular instances by the use of that freedom. The true ground for the decision is policy, *i. e.,* expediency, in the Benthamic sense of 'the greatest good to the greatest number,' 'and the advantages to the community, on the one side and the other, are the only matters really entitled to be weighed.' On the one hand, it ·is the policy of the law to establish rules tending to preserve life, and to protect human beings from serious bodily harm. And this laudable purpose seems frustrated, *pro tanto,* by permitting a landowner to pursue with impunity a mode of user which he knows, or ought to know, is likely to occasionally result in the suffering of great harm on the part of some of his neighbor's children. The fact that

a defendant neither desired nor intended to bring about a particular result does not necessarily exonerate him. The law not unfrequently holds defendants liable irrespective of their intention to do harm, and in some extreme cases may even hold them liable irrespective of the utmost care on their part, practically making them insurers against all harm resulting from certain classes of acts. 'When a responsible defendant seeks to escape from liability for an act which he had notice was likely to cause temporal damage to another, and which has caused such damage in fact, he must show a justification.' And this doctrine may be assumed to apply, even though he had no notice that his act was likely to cause damage to a specific person at a particular moment, but knew only that it was likely to cause damage to some unspecified person at some indefinite time. To escape liability, he must show that there are considerations equal or paramount to those urged in behalf of the plaintiff which justify his conduct notwithstanding the known risk of damage to others therefrom. He must sustain 'a claim of privilege.' On the other hand, the defendant justifies under his right or privilege to make a beneficial use of his own land in methods which will do no harm to persons remaining outside his boundary. The beneficial use of land is a primal necessity, not only to those individual landowners who happen to be defendants in lawsuits, but to the entire human race. 'The business of life must go forward, and the fruits of industry must be protected.' 'It is impossible to carry on the common affairs of life without doing various things which are more or less likely to cause loss or inconvenience to others, or even which obviously tend that way, and this in such a manner that their tendency cannot be remedied by any means short of not acting at all. * * * To say that a man shall not seek profit in business at the expense of others is to say that he shall not do business at all, or that the whole constitution of society shall be altered. Like reasons apply to a man's use of his own land in the common way of husbandry, or otherwise for ordinary and lawful purposes.' It is true that the right of user is never literally absolute, and is always restricted to some extent 'by rights residing in others, and by duties incumbent on the owner.' But it is also true that every restriction diminishes *pro tanto* the beneficial character of the use, and hence the law imposes restrictions as seldom as possible, and never except upon the strongest grounds. If an opposite policy were pursued, it is easily conceivable that the improvement and beneficial occupation of land might become in fact impossible, and property in the soil for nearly all useful purposes might be annihilated. To say, for in-

stance, that B must keep his land in safe condition to be trespassed upon would often result in practically depriving B of certain modes of beneficial enjoyment, unless he takes precautions which are incompatible with profitable user, and might in effect amount to confiscation of his land for the benefit of trespassers. The difficulty of restricting the owner without practically destroying his interest is fully recognized by the law. It has been an important factor in inducing courts to refuse to impose restrictions in various instances where the case in behalf of the landowner is not so strong as in the matter now under consideration. We refer to the class of cases where the use of land, instead of harming only those persons who come upon the land, exerts a damaging influence upon persons and property situated beyond the border of the defendant's land. While there are, of course, many acts thus harmfully operating beyond the limits of his land for which an owner is held liable, there are also various acts of user which confessedly have a damaging effect upon persons and things outside the boundary of the land, and which, nevertheless, the law does not prohibit or punish. * * * The courts do not consider it for the interests of the community that the landowner who does not go beyond certain common and generally beneficial acts of user should be called upon to answer for damage thereby done, even where the thing damaged is outside the limits of his land."

Judge Thompson, in his Law of Negligence, vol. 1, sec. 1031, said:

"In respect of the * * * cases * * * of attractive nuisances, it is to be observed that it would be a barbarous rule of law that would make the owner of land liable for setting a trap thereon, baited with stinking meat, so that his neighbor's dog, attracted by his natural instincts, might run into it, and be killed, and which would exempt him from liability for the consequences of leaving exposed and unguarded on his land a dangerous machine, so that his neighbor's child, attracted to it and tempted to intermeddle with it by instincts equally strong, might thereby be killed, or maimed for life. In view of what has preceded, the author regrets that he cannot say, as he said in his first edition, that such is not the law. He limits himself to expressing the opinion that it ought [not] to be the law, and to citing with commendation the few decisions which hold that it is [not] the law. Nevertheless, a few decisions of enlightened and humane courts are found more or less tending to the conclusion that the owner of any machine or other thing which, from its na-

ture, is especially attractive to children, who are likely to attempt to play with it in obedience to their childish instincts, and yet which is especially dangerous to them, is under the duty of exercising reasonable care to the end of keeping it fastened, guarded, or protected so as to prevent them from injuring themselves while playing or coming in contact with it."

In Shearman & Redfield on the Law of Negligence, sec. 98, it is said:

"The overwhelming weight of authority, both in number of decisions and in soundness of reasoning, by which is established the right of little children to recover for injuries suffered while trespassing, should alone be sufficient to settle this question. Innocence and mistake are no excuse for a trespass, and therefore one committed by a child is just as truly a trespass as if committed by an adult. The owner of premises has precisely the same right to eject a child therefrom as he has to eject a full-grown man. He has the same right to recover nominal damages in each case. But, when he is sued for damages caused by his negligence towards a trespasser, he finds that there is a wonderful difference between the probable result of the suit if the plaintiff is a child, and the probable result of a like suit by an adult. Is there any intelligible ground of distinction to account for this difference, except that the child is presumably not guilty of conscious negligence, while the man presumably is? When the man proves that he was ignorant of the fact that he was trespassing, or shows that his trespass was only technical, and such as he might reasonably suppose would not be objected to by the defendant, and did not in fact produce any appreciable injury or annoyance, his right to recover is just as good as that of an infant. All this is well settled. And what inference can possibly be drawn from such decisions, if not that the plaintiff's trespass is only a circumstance tending to prove contributory fault upon his part, and not in and of itself such fault or attended with the usual effects of such fault?"

In Whittaker's Smith on Negligence, sec. 77, it is stated, in the editorial notes, that the rule that a licensee or trespasser ordinarily enters land at his own risk is subject to an exception where the danger is exposed, and such as might be reasonably apprehended, and, in the text, at page 513, in discussing contributory negligence of children, it is said:

"The doctrine of contributory negligence is applied to children, and to those having the control of them. In one case, Chan-

nell, B., at *nisi prius* is reported to have said: 'The doctrine of contributory negligence does not apply to an infant of tender age.' This rule is scarcely satisfactory. because it is difficult to say what is or is not a tender age; but a better rule which would probably excuse the negligence of a child of tender age is that a child is only bound to exercise such a degree of care as children of his particular age may be presumed capable of exercising."

In *Id.* 66, it is said:

"If A. digs a hole in his land, and B., who has a right to personal security (but no right to be on the land) falls into it, A.'s right is paramount to B.'s, and no question of negligence arises; but, if A. had permitted B. to come upon his land, the rights would be equal, and questions of negligence would arise, viz.: Whether the pit was negligently left unguarded, and whether B. was using his right of being there with care."

And in *Id.* 79-81, it is said:

"But such owner will be liable for anything in the nature of a trap upon the premises, known to him, and as to which he gives no warning to the licensee. He must not do anything to alter the premises, so as to be likely to cause injury, without notice to the licensee. Upon the whole I incline to think, with Mr. Campbell, that the owner is bound to take ordinary care with respect to a bare licensee. The question is, as I think, one of great difficulty. It is said that the licensee, being there merely for his own advantage, can only demand that slight care which a gratuitous bailee is bound to display, and so far the proposition is correct; but I am not sure, if a gratuitous bailee were to indicate a place of deposit, whether he would not be undertaking that that particular place was reasonably fit for the deposit, and, if so, a similar agreement would apply to an owner who gives leave to come upon his property, viz.: That he has undertaken that his property is in some degree fit for the licensee to use. If this be so, it seems that he ought to take ordinary care. The courts, however, have distinctly held that the owner is only liable for 'gross' negligence, because he is in the same position as a gratuitous bailee; but I am inclined to think the assumption is not accurate. I think that the question is only further obscured by insisting that the owner must be guilty of an act of commission to render him liable to the licensee. It may be very frequently the case that omissions are slighter neglects than acts of commission; but they may very well be the contrary, and sometimes are so. If the neglect be of a grave and obvious character,

it would matter nothing whether it was an omission or commission. For instance, it would matter nothing whether a signalman omitted by grave and obvious negligence to pull the handle to direct an express upon its proper line, or whether he negligently pulled the wrong handle. Where there is something done by the owner which is in the nature of a  *  *  *  wanton injury, he will be liable to an action for negligence even by a trespasser, as if an owner of premises with great recklessness shot a trespasser, or if the owner set spring guns upon his premises and injure a trespasser. But where a trespasser took shelter from a storm in a ruinous house not fenced off from the road, and a wall fell upon him and injured him, it was held that he could not recover. · Upon this principle it has been held that, where an owner or occupier of lands makes an excavation upon his land so near to a public highway as to be dangerous under ordinary circumstances to persons passing by, it is his duty to take reasonable care to guard such excavation, and he is liable for injuries caused, even if such persons are consciously or unconsciously straying from the way. Where the excavation is at a considerable distance, no such care need be taken. What is a considerable distance, it is impossible to say, and, in truth, each case depends upon its own facts."

We agree with the view of this author that the landowner is bound to take ordinary care with respect to a bare licensee; but we do so upon the assumption that he uses the expression "ordinary care" as meaning such care as a person of ordinary prudence would usually exercise under the facts and circumstances in such case, although such care be slight in comparison with the care such person would usually exercise about their own affairs of more than slight importance, and, indeed, sections 2689 and 2691, St. Okla. 1890 (sections 2917 and 2919, Rev. Laws 1910), make it clear that the degrees of care (section 2688, St. Okla. 1890, same being section 2916, Rev. Laws 1910) and the degrees of negligence (section 2690, St. Okla. 1890, same being section 2918, Rev. Laws 1910) refer to the differences in the degrees such persons usually exercise in their own affairs of different degrees of importance, and not to any difference in degrees of care in the same case or under the same state of facts— the rule of three such degrees being thus not inconsistent with the rule that the measure of duty and test of negligence and lia-

bility is that one degree of care which a person of ordinary prudence would usually exercise under the facts and circumstances of the particular case.

We also agree with the view of this author that, although not usually so, an omission may constitute a greater neglect of duty than an act of commission, so that the rule holding a land owner liable for acts of commission, and not liable for mere omissions resulting in harm to a bare licensee, is not sound, and is indefensible, and that, "where there is something done" (and we would add, "or omitted") "by the landowner which is in the nature of * * * a wanton injury, he will be liable to an action for injury even to a trespasser." In our opinion what omission or act of commission, free from intent to injure, will amount to wantonness and render the landowner liable to a trespasser must depend upon the facts and circumstances of each case. The character of the danger and the position of the land-owner in respect to his actual knowledge or thoughtlessness of the dangerous condition of his premises, and of its attractiveness and accessibility to merely technical trespassers, especially such as children of tender age, as well as of every other fact and circumstance bearing upon the probability of such trespasses and the probability of injury to trespassers from contact with such dangerous condition, together with the smallness of the expense or effort required to eliminate such danger, bear upon the question of wantonness, and it is not difficult to conceive of a great variety of instances in which a landowner, indifferent and thoughtless of the safety of other persons, might, without intent to injure, be guilty of unquestionable wantonness.

There appears to be no denial of the doctrine of liability to injured trespassers for wanton acts of a landowner; but a great many of the cases, with which we are unable to agree, in effect, limit such liability to acts of commission, thus holding, in effect, that there can be no wantonness in an omission, or, if so, that it creates no liability to a trespasser, even though the trespass be merely technical and even unconscious. It is no doubt true that wantonness should not be inferred from the mere omission to make safe a dangerous place upon one's premises in the absence

of sufficient evidence to show a reckless disregard for the life, limb, body, or health of another or others; but, if wantonness be proven, we are of opinion that it is immaterial whether it consists of an act of commission or a mere omission.

A principle that appears to be deducible from much of the case law on the subject allowing recovery is that it is not only the duty of a landowner to a trespasser to not injure him intentionally or wantonly, but that an act or omission involving a reckless indifference to the safety of reasonably anticipated technical trespassers, such as children of tender years, although without intent to injure, may be wanton. It is undoubtedly the general rule that a landowner does not owe a trespasser any further or greater duty than this; but his duty to an invited person upon his premises is quite different, and requires of him reasonable care for the safety of such person.

As used in this opinion, the words "wanton," "wantonly," and "wantonness" mean and are applicable to acts or omissions of a landowner involving reckless disregard for the safety of such, if any, merely technical trespassers as should in reason have been anticipated by a person of ordinary prudence, and such acts or omissions may be "wanton," "wantonly" done, or the result of "wantonness," although merely thoughtless or heedless in their superficial character, and free from intent to injure.

As stated in Book 1 (Lewis' Ed.) Blackstone's Commentaries, p. 117:

"The right of personal security consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health," etc.

In view of the great value and vital importance of this right and the well-known disposition and lack of self-control in children, we see no sufficient reason why a landowner should not, at least, be deemed in duty bound to make reasonably safe any obviously dangerous, artificial, and attractive condition on his premises, which in character is clearly different from common and well-known dangerous natural conditions, especially when he is able to do so at little or no cost, and without appreciable impairment of his beneficial use of the same in all cases in which his

failure to do so involves reckless disregard for the safety of children of tender years, especially children under seven years of age, or, in the absence of evidence of capacity to be guilty of contributory negligence, under fourteen years of age, as a person of ordinary prudence must anticipate will probably be attracted to and may come in contact with and be injured by such dangerous conditions. Is it anything less than wantonness for a landowner, with actual knowledge of such dangerous, artificial, and attractive conditions of his premises, and of facts from which, as a reasonably thoughtful person, he must know that merely technical, if not unconscious, trespassers in the persons of children living or accustomed to congregate or be near by may come in contact with and be seriously injured by such dangerous conditions, to abstain from removing the danger of such conditions, especially if he is able to do so at little or no cost, and without appreciable impairment of his beneficial use of the premises?

It may be that parents, by proper example and correctly enforced precepts, can greatly reduce the number of injuries resulting from the trespassing children and their contact with the dangerous condition of the premises upon which such trespasses are made, especially if the parents have correct and positive convictions, with which the child may be indoctrinated in many ways; but the senses of sight, taste, hearing, touch, and smell in children of tender years are particularly eager for gratification, and their instinctive desire to examine and explore, to them, strange, mysterious, and wonderful things and places, generally accentuated by much surplus energy, is often stronger than the influence of even the best and highest degree of parental effort to instruct and restrain.

These are matters of common knowledge, and the moral duty of landowners to supplement the duty of parents in respect to trespassing by children should certainly become a legal one, when, under all the facts and circumstances in the case, a failure to do so amounts to wantonness, i. e., a reckless disregard or heedlessness for their safety.

The greater and farther removed from the natural and common in character the danger, and the greater the probability of

contact therewith and injury therefrom by persons, especially children of tender years, who are merely technical, if not unconscious, trespassers, and the smaller the expense and inconvenience of eliminating the danger, the clearer appears to be the wantonness.

In the light of the known danger in turntables, high explosives, electric currents, and the like, and the disposition of children, was the act or omission of the landowner in most, if not all, the cases in which recovery for injuries to children has been allowed to stand anything less than wantonness? We think there is, at least, evidence reasonably tending to prove wantonness in most of them.

The walls and spaces of a deserted building such as this, where children may play hide and seek, and hunt hens' nests, as the evidence shows they did do about this building, and otherwise gratify their childish instincts, are undoubtedly exceptionally attractive places to children, and an intrusion by children of the age of the deceased child should be presumed, in the absence of evidence to the contrary, to be not merely a technical but an unconscious trespass.

In *C., R. I. & P. Ry. Co. v. Baroni,* 32 Okla. 340, 122 Pac. 926, it was held proper to submit to the jury the question of contributory negligence, permitting the jury to take into consideration the age, experience, and maturity of the child, and the general rule appears to be that a child under seven years of age is incapable as a matter of law, and one between the age of seven and fourteen may or may not be capable of contributory negligence, depending upon the age, experience, and capacity to understand, to appreciate, and avoid the danger to which the child is exposed under all circumstances of the case, the care required being the same care that a person of the same age, education, and mental and physical capacity uses under like circumstances, and the contributory negligence of such child is usually held to be a question for the jury. See notes to *Schoonover v. Baltimore, etc., R. Co.,* Ann. Cas. 1913B, 969; 1 Ann. Cas. 895; 17 Ann. Cas. 353, 14 Am. St. Rep. 590; 49 Am. St. Rep. 408.

In deference to the fact that this is the first time the doctrine of the "turntable cases" has been presented for the consideration of this court, we have quoted quite extensively from authorities touching and illustrating some of the varient views upon the same; but, in respect to such quotations, we do not desire to be understood as approving or disapproving further than expressly shown in this opinion.

In the brief for defendant it is urged that it was not in duty bound to keep its unused pump station securely locked and barred from the entrance of children, and that the doctrine of the so-called "turntable" cases is not sound; but the question of wantonness as a ground for recovery is not discussed.

We deem it unnecessary to more specifically point out the logical sequence of the foregoing views touching any question presented by defendant, in view of the necessity of a reversal of this case upon a distinct ground hereinafter shown, except that it appears that the demurrer to the petition should have been sustained, in view of the fact that the allegations do not show a reckless disregard for the safety of such technical trespassers as the deceased boy, and wantonness is not expressly nor by necessary implication alleged.

It is true that the petition alleges facts from which wantonness might be inferred, if the court was at liberty to indulge such inference in favor of the pleader; but, "in the construction of a pleading, challenged by a demurrer before trial, nothing will be assumed in favor of the pleader which has not been averred, as the law does not presume that a party's pleadings are less strong than the facts of the case warrant." *Atwood v. Rose,* 32 Okla. 355, 122 Pac. 929.

It is urged by the defendant that the right of action for the death of Thompkins Cheek was personal to and expired with the original plaintiff, the father of the decedent; that it was not susceptible of revivor for the reason that it did not exist after the death of the original plaintiff.

Section 4312, St. Okla. 1893 (section 5280, Rev. Laws 1910), reads:

"No action pending in any court shall abate by the death of either or both of the parties, thereto. * * * "

But we do not understand this section to impart the quality of survivability to causes of action which do not have that quality under the next preceding section (section 4311, St. Okla. 1893, same being section 5279, Rev. Laws 1910), which reads:

"In addition to the causes of action which survive at common law, causes of action for mesne profits, or for an injury to the person, or to real or personal estate, or for any deceit or fraud, shall also survive; and the action may be brought, notwithstanding the death of the person entitled or liable to the same."

These sections of our statute were adopted from Kansas, and, in two cases decided by the courts of that state, before such adoption, language is used which gives some color to the contention that an action for pecuniary loss resulting from death wrongfully caused under section 4313, St. Okla. 1893 (section 5281, Rev. Laws 1910), is not within any provision of section 4311, *supra;* but due examination of these cases will show that this precise question should be regarded as not settled thereby, and as still open.

In *A., T. & S. F. Ry. Co. v. Rowe,* 56 Kan. 411, 43 Pac. 683, the latest of those cases, where a person wrongfully injured commenced action, and, while same was pending, died from another and independent cause, the court held that his entire cause of action for the injury survived and did not abate under sections 4311 and 4312, *supra;* the *arguments* therein as to the nature of the cause of action given by section 4313, *supra,* being inapplicable.

In the *City of Eureka v. Merrifield et al.,* 53 Kan. 794, 37 Pac. 113, the other one of these cases, it is held that section 4311, *supra,* construed with sections 4312 and 4313, *supra,* "only permits actions to survive *for injury to the person* when death does not result from the injury"; but, in that case, the only question was as to the sufficiency of the petition of the parents, as next of kin, suing for their own pecuniary loss sustained by reason of the wrongfully caused death of their child, in the absence of any allegation that the child, at the time of such death, was a nonresident of the state, or that no administrator had been appointed

for his estate. The action was for "death" under section 4313, supra, and section 4314, St. Okla. 1893 (section 5282, Rev. Laws 1910), and not for the personal injury for which he might have sued had he lived, the survivability of their cause of action was in no wise involved, the quoted holding of the court was apparently foreign to any question before it, and this language no doubt was merely intended to give expression to the indisputable view that the language *"or for injury to the person,"* used in section 4311, *supra,* does not impart the quality of survivability to the cause of action *for death* given by section 4313, *supra;* these two causes of action being separate and distinct.

Section 4311, *supra,* however, apparently stamps with the quality of survivability every cause of action which would survive at common law and every cause of action for injury to "personal estate," and, if the cause of action in this case survived the death of James Cheek, the original plaintiff, it must do so because section 4313, *supra,* does not give a right of action merely for a wrong to a domestic relation or to the person of the beneficiary, but stamps with the character of "estate" or property right the pecuniary interest of the father in the life of the child, at the time of the wrongfully caused death of the latter, which the former is allowed to recover.

Section 4313, *supra,* reads as follows:

"When the death of one is caused by the wrongful act or omission of another the personal representatives of the former, may maintain an action therefor against the latter, if the former might have maintained an action had he lived, against the latter for an injury for the same act or omission. The action must be commenced within two years. The damages * * * must inure to the exclusive benefit of the widow and children, if any, or next of kin, to be distributed in the same manner as personal property of the deceased."

Section 4314, *supra,* reads as follows:

"In all cases where the residence of the party whose death has been caused as set forth in the preceding section, is at the time of his death in any other state or territory, or when, being a resident of this state, no personal representative is or has been appointed, the action provided in said section may be brought by

the widow, or where there is no widow, by the next of kin of such deceased."

The death for which this action was brought occurred prior to the amendment of section 6893 (6261) St. Okla. 1890, by Sess. Laws 1909, p. 548 (Comp. Laws 1909, sec. 8985), which went into effect June 10, 1909 (see section 8418, Rev. Laws 1910, for history of act); and, under the provisions of section 6893, *supra,* the father was the sole heir, and therefore the only "next of kin" of the deceased child.

Section 4067, St. Okla. 1890 (section 6586, Rev. Laws 1910), declares all things susceptible of ownership to be property within the meaning of the chapter relating to the nature of property, and section 4068, St. Okla. 1890 (section 6587, Rev. Laws 1910), includes among its specifications of what may be owned "rights created or granted by statute."

In *Michigan Central R. Co. v. Vreeland,* 227 U. S. 59, 33 Sup. Ct. 192, 57 L. Ed. 417, an action founded upon the Employers' Liability Act of Congress of 1908 (Act April 22, 1908, c. 149, 35 Stat. 65 [U. S. Comp. St. Supp. 1911, p. 1322]), it is said:

"The statute, in giving an action for the benefit of certain members of the family of the decedent, is essentially identical with the first act which ever provided for a cause of action arising out of the death of a human being—that of 9 and 10 Vict. c. 93, known as Lord Campbell's Act.   This act has been, in its distinguishing features, re-enacted in many of the states, and both in the courts of the states and of England has been construed, not as operating as a continuance of any right of action which the injured person would have had but for his death, but as a new or independent cause of action for the purpose of compensating certain  *  *  *  members of the family for the deprivation, pecuniarily resulting to them from his wrongful death."

In the same case Patterson, Railway Accident Law, sec. 401, is approvingly quoted as stating that the term "pecuniary loss or damage" is judicially employed, in cases arising under such statutes, as follows:

"Not only to express the character of that loss to the beneficial plaintiffs which is the foundation of their right of recovery, but also to discriminate between a material loss which is sus-

ceptible of a pecuniary valuation, and that inestimable loss of the society and companionship of the deceased relative upon which, in the nature of things, it is not possible to set a pecuniary valuation."

The measure of damages recoverable under section 4313, *supra*, as held under similar statutes in other jurisdictions, is limited to the pecuniary loss sustained by the beneficiaries therein specified (*M., K. & T. Ry. Co. v. West*, 38 Okla. 581, 134 Pac. 655; *St. L. & S. F. R. Co. v. Long, ante*, 137 Pac. 1156; *M., K. & T. Ry. Co. v. Lenahan*, 39 Okla. 283, 135 Pac. 383; and *K. P. Ry. Co. v. Cutter, as Administratrix, etc.*, 19 Kan. [2d Ed.] 83), and this tends to show that a species of estate, a property right, was conferred upon the father, as next of kin, by this statute.

A recent case holding that a right of action for death under the statutes of Illinois, which do not appear materially different from our own in this respect, accrues immediately upon death, becomes an asset of the estate of the beneficiary, and survives the death of the beneficiary, is that of *Union Steam Boat Co. v. Chaffin's Adm'rs et al.*, 204 Fed. 412, 122 C. C. A. 598, and in that case the case of *Pitkin v. N. Y. C. & H. R. Co.*, 94 App. Div. 31, 87 N. Y. Supp. 906, which is to the same effect, is cited and quoted.

In notes to *Gilkeson v. Missouri Pacific Ry. Co.*, 17 Ann. Cas. 763-776, several cases holding that the action does survive, as well as others holding that the action does not survive, are cited and reviewed, and the following excerpt from that note seems worthy of quotation here:

"In other of the foregoing decisions adhering to the view that the action survives, the right of the beneficiary in the action has been considered a property right which is survivable, and passes to the representatives upon his death. In such cases this statute creating the cause of action is construed to create a new cause of action in favor of the beneficiaries for the damages sustained by them, and not as continuing the cause of action which the original deceased might have had if he had survived the injury. *Cooper v. Shore Electric Co.*, 63 N. J. Law, 558, 44 Atl. 633; *Meekin v. Brooklyn Heights R. Co.*, 164 N. Y. 145, 58 N. E. 50, 51 L. R. A. 235, 79 Am. St. Rep. 635; *Mundt v. Glokner*,

24 App. Div. 110, 48 N. Y. Supp. 940, appeal dismissed 160 N. Y. 571, 55 N. E. 297; *Pitkin v. N. Y. Cent., etc., R. Co.,* 94 App. Div. 31, 87 N. Y. Supp. 906.   In *Meekin v. Brooklyn Heights R. Co.* [164 N. Y. 145, 58 N. E. 50, 51 L. R. A. 235, 79 Am. St. Rep. 635], *supra,* the court said: 'Thus it appears, both from the statute and the authorities, that the damages awarded for the negligent act are such as result to the property rights of the person or persons for whose benefit the cause of action was created.   Nothing is allowed for a personal injury to the personal representatives or to the beneficiaries; but the allowance is simply for injuries to the estate of the latter caused by the wrongful act.   The statute, as it has been held, is not simply remedial, but creates a new cause of action in favor of the personal representatives of the deceased, which is wholly distinct from and not a revivor of the cause of action, which, if he had survived, he would have had for his bodily injury.'   In *Cooper v. Shore Electric Co.,* 63 N. J. Law, 558, 44 Atl. 633, the court said: 'The controlling feature in this legislation is that damages are made recoverable for causing death as compensation for the pecuniary injury the designated beneficiaries have sustained by reason of the death.   If there be no widow or next of kin at the time of the death of the deceased, the pecuniary injury contemplated by the statute does not exist, and the action cannot be maintained.   It is also clear that the pecuniary injury to be compensated for is that of the widow or persons who are next of kin at the time of the death of the deceased, and that the cause of action created by the statute inures to such persons as a vested right.   By this statute a property right is created in the beneficiary of such a nature as would give the action the quality of survivorship, and take it out of the maxim, *"actio personalis moritur cum persona."* '   In *Haggerty v. Pittston,* 17 Pa. Super. Ct. 151, an action by a father for the death of his daughter was continued, upon the father's decease, in the name of his administrator; the court considering the value of the life lost as a species of property which vested in the father.   In *Thomas v. Maysville Gas Co.,* 112 Ky. 569, 66 S. W. 398, the survival of an action brought by an administrator for the benefit of a sole beneficiary was sustained; the court holding that the action should be continued by the administrator, and the funds, when collected, held for the estate of the beneficiary.   The court said: 'The fact that the defendant to the action succeeded in defeating a recovery until one or more of the beneficiaries died had no effect upon its liability to the administrator.' "

But this Kentucky case cannot be regarded as of great weight as authority here, as the Kentucky statutes are materially different from our own.

The New York death statute does not appear unlike our own in any material respect, and in the Meekin case cited, *supra,* it is further said in the opinion:

"In *Quin v. Moore,* 15 N. Y. 432, it was held that the interest of the beneficiary was capable of assignment, which is the test of the right to revive. In deciding the case, the court said: 'The interest of Mrs. Kerns was also assignable. In respect to purely personal torts, it is true that at common law the right of action ceases with the life of the injured party. But in this case, although the tort was personal to the child who died, the statute comes in and declares that a right of action shall survive to the administrator. The theory of the statute is that the next of kin have a pecuniary interest in the life of the person killed, and the value of this interest is the amount for which the jury are to give their verdict. Neither the personal wrong or outrage to the decedent, nor the pain and suffering he may have endured, are to be taken into account. * * * But the claim of the administrator, and through him of the next of kin, is altogether different. The statute imputes to them a direct pecuniary loss in being deprived of a life to them of greater or less value. * * * The interest which a person has in the life of another on whom he is dependent, or to whose services he is entitled, the Legislature has chosen to regard as a pecuniary right, a right having the essential attributes of property, so that when it is taken away that compensation is due."

The Pennsylvania and New Jersey statutes likewise appear substantially the same as our own in every respect material to this question, and in the New Jersey case cited, *supra,* it is said in the opinion:

"The pecuniary injury of the beneficiary begins immediately on the death of the deceased, and is a continuing injury until compensated for in the condition expressed in the act. Suit must be brought within one year after the death of the deceased; but how long the litigation may be protracted is problematical. If the death of the beneficiary before the end of the litigation discharge the liability of the wrongdoer, the legislative purpose that the wrongdoer should make compensation to the beneficiary for the pecuniary injury sustained by him would be defeated. Such a construction would be contrary to the policy of this legislation,

and would thrust into the administration of a statutory proceeding, which our courts have declared should be beneficially construed, a technical rule of the common law of harsh injustice. The death of the beneficiary pending suit will have a controlling influence over the quantum of recovery. The personal injury sustained would be limited in duration and extent to his lifetime. But the death of the beneficiary pending suit cannot be made available to abrogate the liability of the wrongdoer incurred for the pecuniary injury already sustained. The right to compensation vested in the beneficiary immediately upon the death of the deceased. By the death of the beneficiary pending suit there was neither an abatement of the action in the common-law sense, nor was the cause of action to be compensated for, satisfied, or discharged. It is contended, however, that, inasmuch as the statute does not provide for an executor or administrator for the beneficiary in case of his death before the suit is determined, the action, therefore, abates; but no purpose would be accomplished by introducing such a personal representative into the record. The Legislature selected the personal representative of the original deceased as the party by whom the action should be brought, to whom the control of the suit was committed, to conduct it for the benefit of the next of kin."

It follows from what has been said that defendant's contention that the cause of action by the statutes given James Cheek, the father, as next kin of the deceased child, expired upon the death of the said James Cheek about ten months after the death of the child cannot be sustained, and this action, originally begun by said James Cheek, was, upon his death, properly revived in the name of the mother, Fannie W. Cheek, as administratrix of the estate of James Cheek, upon a stipulation, duly signed and filed, which reads as follows:

"It is hereby stipulated and agreed, and consent of the defendant is hereby given, that the above-entitled action may be revived in the name of Fannie W. Cheek, administratrix of the estate of James Cheek, deceased, and that said action may proceed in favor of the said Fannie W. Cheek, as administratrix of the said estate, and it is further agreed that an order to revive the same as above stated may be made by the court, or the judge thereof, on the 24th day of January, 1910, or at any time within five days thereafter, as it may suit the convenience of the court to hear the same."

It is also urged, and we hold, that the trial court erred in so instructing the jury as to allow recovery for the value of the child's services beyond the time of the death of James Cheek, the sole beneficiary under the statute, and in refusing to give the following requested instruction, to wit:

"If you find a verdict for the plaintiff under the evidence and instructions, the amount of your verdict should be the actual pecuniary loss which James Cheek, the father of Thompkins Cheek, sustained during his lifetime on account of the death of his son, not exceeding the amount claimed in the petition, $10,000."

This follows necessarily from the limitations of the right given by section 4313, *supra*, to the pecuniary loss or damage suffered by the beneficiary, James Cheek, and there are decided cases to this effect. See *Pitkin v. N. Y. C. R. Co., supra; Cooper v. Shore Electric Co., supra*.

This case should be reversed and remanded for proceedings in accord with the views herein expressed.

By the Court: It is so ordered.