MAE BECKER v. STATE.

No. A-9606.   Opinion Filed Dec. 16, 1929.
(283 Pac. 796.)

D. E. Hodges and Wieck & Armstrong, for plaintiff in error.

J. Berry King, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, J.   The plaintiff in error, hereinafter called the defendant, was jointly charged with Walter Martin, of the crime of murder; was tried separately and convicted of murder, and sentenced to imprisonment in the state penitentiary for life.   Motions in arrest of judgment and for new trial were filed, considered, and overruled, exceptions saved, and the case brought to this court on appeal.

The testimony on behalf of the state, in substance, is as follows:   Carl Reimer testified he was 23 years of age; he lived near Ponca City; on the 27th day of August 1927, he was rooming with Waldo Floyd Becker and Mrs. Mae Becker; Mrs. Becker being the defendant in this case;

"About noon August 27, 1927, I had a conversation with the defendant in this case; she said she tried to get some money from her husband and he would not give it to her; he had around $50 in his pocket, and she was telling us how to get it; she would get him drunk at the dance and slip it out of his pocket and slip it to one of us boys, and we could get away with it; Waldo Floyd Becker was working at the Empire Refinery at the time; he returned to his home about 5:30 in the afternoon of August 27, 1927; there was some beer sitting around there to drink; Floyd Becker had some beer with his meal that evening; I left the house about 6:30, after I had gotten through with supper; I returned to the house about 7:30; Blanche May of Ponca City was with me; we went in my room on the corner; there were five rooms in the house; there were two bedrooms on the east and two on the west; there was a kitchen built in the west end of the house; some of the rooms were not in a sense bedrooms, but were being used for bedrooms; there were three bedrooms, I guess; I used the one on the southeast corner; there was no connecting door between those two bedrooms on the south; after Blanche May and I came into my room I heard loud talking, sounded like there might be some trouble starting and I told her we had better leave, so we got up and left; we got about three blocks—three doors I mean—when I heard something like an explosion, it sounded like a shot, and she went on by herself and I turned and went back to the house; when I got back to the house I saw Walter Martin out in front of the house with a gun in his hand; I asked him what was going on, and he said, 'I killed him;' and I said, 'Who,' and he said, 'Floyd;' I said, 'Let's go back and see;' and he said, 'No, I have got to go,' and I told him to come on back and let's see if you killed him; he turned around and went back to the house then; when we went into the house Floyd was lying on the floor dead, and Mae was lying on him crying; I asked if he was dead and she said he was; when I turned around Martin had a gun in his hand and said, 'Take this gun, and hit me with it,' and I said, 'no'; he turned and went into the other room, and when he came back his face was bleeding, I

believe the blood was on the left side. I am not sure; Martin said, 'You see this was in self-defense;' I said, 'No, I was not here, never seen anything;' he asked me if I would stand by him, and I said, 'I won't know anything;' he asked Mae if she would stand by him, and she told him she would; I then called the police.

"I don't know what the defendant told the officers; I was not in the room much after they came; I did not see any pocketbook in the room." On cross-examination witness stated he had been rooming at the Beckers' about a month. "I stayed at the Cozart Hotel about a month before I moved down there; it was an ordinary thing to have some home-brew at Becker's place; every once in a while we would have a bottle with our meal; I saw the deceased drink about two bottles that evening; we all drank the beer that was there, merely a social like drink; the loud talking I heard was between Mr. and Mrs. Becker; Mrs. Becker is very deaf, you had to talk loud to make her understand; I could not understand any of the conversation between them; I heard her scream, and I left; I could not understand them, as they were two rooms away and the doors were shut. Mrs. Becker did not tell me why she wanted to get some money from her husband; she said that afternoon she tried to get $5 from him; when I had the conversation with her, it was right after dinner; I was around the house a part of the afternoon but most of the time I was up town; I was not working at the time, prior to that I had been working for O. C. Trapp, a cement contractor. The dance at which this money was to be taken from Floyd Becker by his wife was a platform dance close to the River Bridge; I don't know the name of the fellow that was giving it, it was about two miles from the bridge; the Becker home is about a mile west of the bridge, probably close to two miles, this would make the dance between three and four miles from the Becker home, in Osage county; I had been to this place where the dance was going to be given once; Mr. and Mrs. Becker had also been there I think three or four nights before; I had never known Mr. Becker before I started living at the house, which was about 30 days prior to the trouble; there

were two roomers at the Becker house at the time; I paid my room rent to Mrs. Becker; the drinks that were suggested to be given Waldo Floyd Becker were not to be anything but beer; that was all I knew about; there was no dope or drugs to put in it; it was set there before him, and he helped himself; it was set before all of us, and we helped ourselves; the last time I saw Becker alive he was not drunk. I testified in the preliminary hearing; I don't remember stating in the preliminary that I did not hear any conversation between the defendant and Walter Martin."

Witness was asked if in the preliminary the following question was asked him, and he gave the following answer:

"Q. All right, what did the defendant Mae Becker say? A. I don't remember whether she said anything; she may have, she may not have; I would not swear to her saying anything."

And the witness then said: "I don't remember whether I testified to that or not; I don't remember the question you read anyway."

Witness further testified that his recollection had not been refreshed by any one concerning the conversation since the preliminary hearing. Witness was then asked the following question:

"Q. If this is your testimony given at the preliminary hearing, that was in fact your recollection at that time, wasn't it? A. Yes sir. I guess my recollection at the preliminary hearing in September was more definite than it is now."

Witness then stated:

"I was supposed to meet these people at the dance about 10 o'clock; I was going out with my brother; my brother was not in this deal; I was not going out to this dance in particular to get this money; there was never anything said about how much money I was to receive, nor

did I hear anything said about what amount Martin would receive; there was nothing said about splitting the money or what was to be done with it if we could get it; I had known Walter Martin about two years; for about eight months I had known him real well; I first knew him at Granite Reformatory; both of us were doing time; I was in for grand larceny and Martin for car theft; Martin had been to Ponca City from about Monday or Tuesday until Saturday before the killing; I never heard the defendant say anything as the officers came in; I do not know who brought the beer to the house, nor did I know where it came from."

R. B. Brown, called as a witness, testified he was a police officer in Ponca City; he was called to the house where the killing took place; he then described the house and the number of rooms in the house; he saw Carl Reimer and Walter Martin there; when he first walked into the room the defendant was sitting on the bed; she dropped down over her husband and was crying.

"I took hold of her and pushed her back on the bed, and went to look the room over; defendant said she did not know who killed him; 'I don't know anything about it'; a second or so later she says: 'God damn, we battled all over the room; just look how this room is torn up.' " Then she began moving her hand and broke down crying a little again; she said, using an oath, something about some one breaking up their home; Becker was dead at this time; the body was sent to the undertakers."

On cross-examination witness stated at the time of the preliminary examination he had not said anything about the pocketbook for the reason that:

"I was not asked about it; there was no money in the pocketbook I found; it had cards and papers in it; Judge Midcalf found some money in his shirt pocket on the left side; the pocket was not torn so far as I observed; other officers came and I told Sargent Barr and West to

take the defendant to the police station; she did not have her shoes on; I told her to get ready and she did not make any effort to do so, and I told the boys to take her on; she seemed to be intoxicated at the time; they found $50 in the shirt pocket of the deceased."

Dr. A. S. Nucklos, called as a witness, testified to examining the body after it was dead; he found four wounds—

"What I believe to be the first shot fired from the pistol entered the neck to the back and to the outer side, running toward the spinal cord; another shot was about two inches below the left nipple; then another shot about two inches below the border of the ribs on the left side of a straight line down from the left nipple. The fourth shot was about the center of the stomach, kindly over the stomach proper; don't misunderstand me, that is not the bowels, but the stomach proper; I found two of the bullets lodged under the skin; none of them came through."

Sam W. Tulk testified, in substance, the defendant made a statement to me after she had been placed under arrest; Bob Brown, the police officer, was present; it was after midnight, the night of the alleged killing; no coercion was used to make her give the statement, nor was any threat or violence used.

"I had her brought into my office about 1 or 1:30 o'clock in the morning and told her I wanted her to assist in clearing up the killing of her husband, and she said she did not know who killed him; I told her it appeared to me it was impossible for her to be lying right on the bed while her husband was being killed by the side of the bed, and her not know anything about it; she said she did not know who shot him, they must have walked by the door and shot him, she said while she was lying on the bed she did not see anybody in the room; I asked her if he had an enemy that might slip into the room, and she still contended she did not know anything about it; and finally she said, 'well, just say I done it, I killed

him, hang me for it;' and I said, 'No, Mrs. Becker, I don't think you did it, and we are not trying to cause you any trouble. We are trying to get the information from you; trying to find out who the guilty party is that killed your husband;' and she said, 'Just say I done it,' and she closed up and I saw there was no use talking to her any more, and I sent her back to bed and went ahead with my investigation; she never did tell me who did it. At the time I talked with her she was under the influence of liquor, but seemed to know what she was doing; she impressed me she was able to be investigated and talked to at that time."

On cross-examination witness reiterated his statement that at the time he talked to her she showed she had been intoxicated.

At the close of the testimony the defendant moved to strike out the testimony of the witness, for the reason that the statement does not seem to have been voluntary, and that the defendant was not apprised of her rights before making the statement, and for that reason the defendant was incompetent at the time to make the same, which motion was overruled by the court, and defendant excepted.

Viva Masemore testified she was a cousin of the deceased Floyd Becker; witness was asked if she had a conversation with the defendant with reference to the deceased, which was objected to by the defendant, and overruled by the court, and the witness was permitted to answer, and stated she had; that defendant had been drunk one evening and stated she wanted her to help get some money or something. "I don't remember just what it was over." She said he made her so mad she ought to kill him, and that at some time she would. This statement was made in May previous to the killing in August. The defendant moved to strike out the answer, on the

ground that the statement was too remote. The court overruled the matter, stating he was leaving the weight of it for the jury.

On cross-examination witness stated she had stayed at Becker's home; Mrs. Becker was sick, and that the witness, Mrs. Becker, and Becker all slept in the same bed; Mrs. Becker on one side of the bed, Becker in the middle, and the witness on the other side of the bed.

"The defendant asked me at one time to leave; Mrs. Becker did not wake and find me in a compromising position with Mr. Becker. I had been gone about two weeks and came back, and the defendant told me she believed I was in love with Becker, and said Becker and I were too intimate, and for that reason she would not let me stay there any longer; Mrs. Becker was in bed all the time I was there, which was about a week."

The defendant, in her own behalf, stated her name was Mae Becker; she lived in Ponca City; was the wife of Waldo -Floyd Becker, deceased; she and Becker were married May 21, 1925; they had a home in Ponca City partly paid for; she had paid about $400 of the amount and Becker had paid the rest; they had never been given a deed to it.

"Viva Masemore was over there for a while, probably two weeks, and I made her leave because she was loving my husband; that is the only difficulty my husband and I really ever had; I never did intend to kill my husband; when my husband drew his pay check he would cash his check, or I would cash it; we did not have any trouble about money that way; I paid part of the bills and he paid part of them; the day my husband was killed at night I did not have any difficulty with him with reference to money matters, nor did I try to get any money from him that noon; I did not have any conversation with Carl Reimer with reference to getting any money, nor did I have any conversation with him with reference to

getting my husband drunk; I did not say anything to Carl Reimer about getting my husband out to a dance and would steal the money and give part of it to him or Walter Martin; I do my own cooking and had the meal ready when my husband came from work that afternoon; I never noticed how much beer he drank; he was drinking home-brew; it was poured into a pitcher and on the supper table and any one who desired it could help themselves; we had supper at 5 o'clock, immediately after he came in from his work; I was cleaned up by 6 o'clock and we went to town to get Mr. Becker some cigarettes; we were only gone a few minutes, and when we returned I could not say whether Carl Reimer or Walter Martin were at home, because we had a bedroom to ourselves and when we left we always locked our own room, and they could go from their room through the apartment to the bath; their room had an outside entrance; when we came back Mr. Becker and I drank some more beer; I don't know whether Mr. Becker had been drinking whisky that evening or not; I don't know what time of night my husband was shot; I did not have a gun; I could not say who did the shooting; immediately after the shooting Walter Martin told me he did it. I did not see Mr. Martin when the shooting actually occurred; it seemed like the shots all came in a bunch; Mr. Martin was not in the room; I was on the bed when the first shot was fired, they were right fast; I had nothing to do with the killing of my husband; immediately after the shots were fired my husband fell by the side of the bed on the floor; I jumped up from the bed and ran to him, his shirt was burning; I started to leave the room and go to call the police; I came to the door and met Mr. Martin; I don't know when Mr. Reimer came in; Mr. Reimer and Mr. Martin must have been in the room shortly after the shots were fired; I did not know where Mr. Reimer and Mr. Martin were, I did not see them very much, they were back and forth, seemed to me like I was dizzy; there was nothing said in my hearing about an alibi or self-defense; I remember being taken to the police station; I don't know how long it was after my husband was killed; Mr. Brown came to the house shortly after my

husband was shot; I do not remember having any conversation with him; I was so nervous and dizzy I don't know what I said, I just told him to lay the blame or jolt on. me, I would take it."

On cross-examination witness stated she was 25 years of age—

"When I was talking to Bob Brown I was excited and did not know what I was doing; I told him I did not know who did the shooting; Walter Martin told me he did it; when the shot was fired my husband was jerking my hand; he was not trying to get the $50 out of my hand; no, sir, I did not get the $50 out of his pocketbook; I don't know whether I was drunk or not, I was dizzy; the beer we were drinking that night my husband and I made, we did not go out west of Ponca City to get it; Viva Masemore and I had trouble about my husband and I ordered her away from the place; that is the only trouble my husband and I had."

Witness was asked the following question:

"Listen Mae, 'when your husband caught you having intercourse with Carl Reimer, did you have trouble then?' "

This question was objected to as being incompetent, irrelevant, and immaterial, and assuming.

"By the Court: Yes, we assume that he did.

"Q. Well, when your husband caught you and Carl Reimer, did you have trouble? Objected to as incompetent, irrelevant and immaterial. A. No, sir. My husband did not order Carl Reimer away from the house. My husband and I did not have any trouble and my husband compel Carl to leave the place."

"My husband's insurance was made out to his brother; I don't know what amount it was, my husband told me the insurance was made to his brother; my husband drew his pay a few days before he was killed; I had money of

my own to pay my lodge dues; I collected it from my room rent; at the time the shot was fired my husband was jerking me, he was standing up, I do not know what way he was facing when the first shot was fired; he was jerking me to get me off the bed; we had been fussing and fighting that evening; the trouble came up when I spilled some beer on his tie; we had not planned what particular place we would go that night, we were going to either a dance or a picture show; I did not tell Walter Martin or Carl Reimer I wanted some money from my husband and he would not give it to me and I wanted them to help me get it, nor did I tell them I was going to get him drunk at the dance and take the money away from him and give it to one of them and they could get away with it; I don't know which one of the officers took me to the police station; I don't know whether I rode or walked; I do not remember telling them I wanted to go back and get the money; if I mentioned money I don't remember it; I do not know who the man was that fired the shot that killed my husband; he was not in the room; my husband and I had been fussing and fighting that evening about me spilling beer on his tie. Carl Reimer and Walter Martin drank some beer there with us; I don't know whether the others got tight or not; I know I had plenty myself; I remember Sam Tulk talked to me about something, but I don't remember what he said; when Walter told me he had shot my husband I don't remember if he was bleeding or not; we were all drinking at the house while we ate our dinner; I have seen the pocketbook which you mention; he did not carry money in this pocketbook; he carried it in his shirt or his trousers; he had some old German or French money; there is nothing to the insinuation I had intercourse with Carl Reimer; my husband and I never did have any trouble on that subject."

The witness was then excused, and the state announced it desired to recall the defendant for further cross-examination.

"I testified yesterday that I never had any trouble with my husband, but the only trouble we had was little

family rows; some time about two weeks previous to the killing the officers came down to the house; I don't know what they came for, whether my husband called them or not; he told me he called the officers; I do not know why he called the officers; my husband had been drinking." Witness was asked if she had ever been convicted of a crime and answered: "No, sir, I was not convicted in the state of Kansas."

The foregoing is, in substance, the testimony introduced on behalf of the state and defendant.

The defendant assigns 12 errors alleged to have been committed by the trial court. The assignments will be considered as they are presented by the defendant in her brief. The first assignments discussed by the defendant are assignments 9, 4, and 5, and a portion of No. 11, which assignments are as follows:

"No. 9. That the court erred in refusing to sustain the motion for a directed verdict of 'Not Guilty' interposed by the plaintiff in error at the close of the introduction of all evidence introduced on trial of said cause, to which refusal the plaintiff in error duly excepted.

"No. 4. That said verdict is contrary to the evidence.

"No. 5. That said verdict is not supported by the evidence.

"No. 11. That the court erred in refusing to give certain instructions requested to be given by the plaintiff in error, to-wit: Requested instructions numbered 6:

"You are instructed that if you believe beyond a reasonable doubt that the defendant had conspired with others to commit a felony, that the acts claimed by the state to have been done by the defendant in furtherance of said felony are not sufficient to constitute an attempt to commit a felony or the engaging in the commission of a felony."

Section 1733 Compiled Statutes 1921, defines homicide as follows:

"Homicide is murder in the following cases:

"First. When perpetrated without authority of law and with a premeditated design to effect the death of the person killed, or of any other human being.

"Second. When perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.

"Third. When perpetrated without any design to effect death by a person engaged in the commission of any felony."

"Fourth. (1923 Session Laws, Chapter 2.) Any person who sells, gives away, or otherwise furnishes any liquor, preparation or compound for beverage purposes, and which results in death, shall be guilty of murder."

Reviewing the opening statement of the county attorney, it is clear he did not contend this homicide was perpetrated without authority of law, and with the premeditated design to effect the death of the deceased, or any other person, nor is it claimed by the state that the homicide was perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of an individual.

It is not contended that the defendant sold, gave away, or otherwise furnished any liquor, preparation, or compound for beverage purposes, which resulted directly in the death of Waldo Floyd Becker. In the opening statement of the county attorney and in the presentation of the state's testimony, the state based its entire case upon the fact that the said Mae Becker was engaged in

the commission of a felony, in attempting to rob her husband, at the time the fatal shot was fired by one of her alleged accomplices.

The defendant in her argument contends that if the testimony of the state, which was admitted over the objection of the defendant, as to the conspiracy, be true, the parties at the time of the homicide was committed had not entered upon the commission of the felony named and were only preparing to do so, and that a clear distinction is drawn by the courts between the acts amounting to the commission of a felony and the acts amounting to preparation for the commission of the felony. It is further contended by the defendant that the testimony of the state is insufficient to show that the defendant, and her alleged accomplices, Martin and Reimer, were engaged in the commission of a felony at the time the homicide in question occurred.

It is further contended by the defendant that all the testimony introduced by the state tending to show a plan to rob the defendant cannot amount to more than acts of preparation for the commission of said felony, and the defendant insists that the trial court erred in not directing a verdict in this case, as the state relied exclusively upon the conspiracy detailed by the witness Reimer as to the conspiracy, and that this defendant was actually engaged in the felony at the time her husband was killed. The defendant contends that the verdict of the jury is contrary to the law and the evidence.

16 Corpus Juris, p. 114, states as follows:

"No definite rule, applicable to all cases, can be laid down as to what constitutes an overt act or acts tending to accomplish a particular case. Each case must depend largely upon its particular facts and the inferences which

the jury may reasonably draw therefrom. It is well settled, however, that something more than mere preparation or planning is essential. The accused must take at least one step beyond preparation by doing something directly moving toward and bringing him nearer the crime he intends to commit. In other words, while the act need not be the last approximate act to the consummation of the offense intended to be perpetrated, it must be such as will apparently result, in the usual and natural course of events, if not hindered by extraneous causes, in the commission of the crime itself."

In Ex parte Turner, 3 Okla. Cr. 168, 104 Pac. 1071, this court was confronted with the question of whether or not the evidence submitted made out a felonious charge against the prisoner, and at page 173 of 3 Okla. Cr. of this case, 104 Pac. 1073, the following language is used:

"In Hicks v. Com., 86 Va. 223, 9 S. E. 1024. 19 Am. St. Rep. 891, the Supreme Court of Virginia, in considering an indictment charging the defendant with attempt to poison, with intent to kill, one A., by buying the poison and delivering it to one L., and soliciting her to administer it in coffee to A., say: 'An attempt to commit a crime is compounded of two elements: (1) The intent to commit it; and (2) a direct ineffectual act done towards its commission.' 2 Bishop, Crim. Proc. par. 71. Or, as Wharten defines it: 'An attempt is an intended, apparent, unfinished crime.'

"Therefore the act must reach far enough towards the accomplishment of the desired result to amount to the commencement of the consummation. It must be not merely preparatory. In other words, while it need not be the last proximate act to the consummation of the offense attempted to be perpetrated, it must approach sufficiently near to it to stand either as the first or some subsequent step in a direct movement towards the commission of the offense after the preparations are made. McDade v. People, 29 Mich. 50; Bouv. Law Dict. 'Attempt.'"

In this case the state's strongest evidence, if the testimony of the accomplice Carl Reimer is to be believed, only shows acts of preparation consisting of devising or arranging the means or measures to commit the offense intended, namely, the robbery of Waldo Floyd Becker. The record does not reveal any evidence tending to show that this defendant actually was engaged in the commission of robbery, or any other felony, at the time the shooting is alleged to have occurred. The record discloses that the deceased had been drinking home-brew, as it was his custom to do daily during the evening meal. This alone would not amount to an attempt on the part of the defendant to commit felony when there was no evidence that the deceased was urged to drink. This question has been considered by many courts. The general rule is that acts of the party must proceed beyond mere preparation before that party is guilty of an offense of attempt to commit a felony, and have construed acts of defendants as mere acts of the defendant preparatory of an attempt to rob. Cornwell v. Fraternal Acc. Association of America, 6 N. D. 201, 69 N. W. 191, 40 L. R. A. 437, 66 Am. St. Rep. 601; Ex parte Floyd, 7 Cal. App. 588, 95 Pac. 175; Commonwealth v. Eagan, 190 Pa. 10, 42 A. 374; State of Vt. v. John Hurley, 79 Vt. 28, 64 A. 78, 6 L. R. A. (N. S.) 804, 118 Am. St. Rep. 934; Groves v. State of Ga., 116 Ga. 516, 42 S. E. 755, 59 L. R. A. 598.

In Cole v. State, 14 Okla. Cr. 18, 166 Pac. 1115, L. R. A. 1918A, 94, this court distinguished between attempt and mere preparation or solicitation in the case in which the defendant was charged with attempting to commit adultery. The first paragraph of the syllabus is as follows:

"Mere solicitation to commit adultery cannot be prosecuted under the law as an attempt to commit adultery."

And in said case the court quotes with approval from the opinion in Ex parte Turner, supra.

In State v. Thomason, 23 Okla. Cr. 104, 212 Pac. 1026, this court, in the third paragraph of the syllabus by the editorial staff, said:

"An 'overt act,' as an element of an attempt to commit a crime, must be something done that directly moves toward the crime, and brings the accused nearer to its commission than mere acts of preparation or of planning, and will apparently result, in the usual and natural course of events, if not hindered by extraneous causes, in the commission of the crime itself."

In this case the conspiracy agreed to be committed, if true, between the defendant, Reimer, and Martin, was not such a conspiracy as to require the use of force or violence in its commission, nor was it such as might result in the unlawful taking of human life. We do not believe the testimony is sufficient to show that the act of killing in this case was within the scope of the conspiracy testified to by Reimer and such an act as would make this defendant liable for the act of Martin in shooting the deceased, unless the state should produce some evidence sufficient to convince the jury beyond a reasonable doubt that this defendant aided and abetted Martin in his action independent of the proof of the conspiracy itself. This defendant may be guilty of the commission of either murder or manslaughter in the shooting and killing of her husband, either by herself or by Martin, as disclosed by the circumstantial evidence and other evidence in this case, but the question of her guilt should be based on a different theory than the theory of conspiracy submitted to the jury in the trial of this case. This killing may have been the result of the shooting by the defendant while engaged in a drunken brawl, or it may have

been the result of the shooting of Becker by Martin, who rushed to the aid of Mrs. Becker when he thought she was being attacked by her husband, and in danger of losing her life or receiving great bodily harm. We believe that under the evidence in this case the question of the guilt of Mrs. Becker of the murder should have been submitted to the jury as well as the question of manslaughter. We cannot see wherein this killing under the proof in this case could be said to be within the contemplated conspiracy of stealing from the person of the deceased his money without the use of force or violence.

We hold the court erred in its instructions to the jury, in restricting the jury to the guilt of the defendant of murder. Under the evidence in this case the guilt of the defendant of murder or manslaughter should have been submitted to the jury.

It is further urged by the defendant that the court erred in refusing to give the requested instruction to the jury, that under section 2701, C. O. S. 1921, a conviction could not be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. The witness Carl Reimer, if there is any truth in his statements, was an accomplice in the planning and preparing to get the deceased out to the dance in Osage county, some three or four miles from the home of the deceased, and, it being true that the witness Reimer was an accomplice, it was necessary that the evidence given by him of the conspiracy should be corroborated by other testimony showing the conspiracy agreed to, and an effort to carry it out independently of the fact that the deceased was killed.

An examination of the record shows there were five other witnesses in this case; R. B. Brown, who was a police officer, merely shows the commission of the offense; Dr. Nucklos, that death resulted from gunshot wounds; Sam W. Tulk reveals a statement made by the defendant following the shooting—neither of which tends to corroborate the testimony of Carl Reimer. Viva Masemore testified as to domestic trouble in the Becker family; her testimony in no way tends to corroborate Reimer. C. E. Barr, the desk officer, made no statement tending to corroborate the testimony of Carl Reimer.

In Jones v. State, 14 Okla. Cr. 217, 169 Pac. 1133, in the first paragraph of the syllabus, this court said:

"The uncorroborated statement of an accomplice which tends to connect another with the commission of a crime is insufficient to support a judgment of conviction."

This court has reaffirmed this doctrine in many cases since the Jones Case. Jolliffee v. State, 21 Okla. Cr. 278, 207 Pac. 454; McKinney v. State, 20 Okla., Cr. 134, 201 Pac. 673.

There is no testimony whatever to corroborate Carl Reimer, and the question of corroboration is a question for the court and not for the jury. This court in Jolliffee v. State, supra, in third paragraph of the syllabus said: "Where it is admitted that, if the defendant is culpably implicated in the theft at all, the witness was an accomplice, the question of whether he was an accomplice is a question of law for the court, and not a question of fact for the jury, and the jury should be so instructed."

We hold that under the facts in this case, and the law as applied to the facts, the court erred in not advising the jury as to the question of law that the witness Carl Reimer was an accomplice, and that the court erred in

restricting his instructions on the question of proven conspiracy, and in not submitting the question of murder and manslaughter, on the circumstantial evidence contained in the record, to the jury.

For the reasons herein stated the case is reversed and remanded, with directions to grant a new trial and proceed in accordance with this opinion.

EDWARDS, P. J., and CHAPPELL, J., concur.