## CHARLES DUNBAR v. STATE.

No. A-10076. Nov. 12, 1942.

(131 P. 2d 116.)

A. Lee Battenfield, of Pryor, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DOYLE, J.  Appellant was tried on an information which, omitting formal parts, charged that Charles Dunbar did in Mayes county, on or about the 15th day of May, 1940, commit the crime of assault with intent to kill in manner as follows:

That on the day aforesaid, he did unlawfully, willfully, intentionally and feloniously, make an assault upon one Floyd M. Henry, with a certain weapon, to wit, a Winchester, which he then and there had and held in his hands, that he did then and there go to his automobile and take therefrom said Winchester, and did then and there load said Winchester by putting in the chamber of said Winchester shells or leaden bullets, and did then and there brandish said Winchester, bringing it up in position to shoot, did point said Winchester at and towards the said Floyd M. Henry, who at said time did run and escape into and through a certain garage nearby to the M., K. & T. Depot, nearby; that said Charles Dunbar followed and pursued said Floyd M. Henry with said Winchester with the unlawful and felonious intent, then and there on the part of him the said Charles Dunbar, to kill him the said Floyd M. Henry, contrary to, etc.

December 10, 1940, the jury rendered the following verdict:

"We the jury duly drawn, impaneled and sworn in the above entitled cause do upon our oaths find the de-

fendant guilty of 'assault with a dangerous weapon' as charged in the Information and assess his punishment at imprisonment in the State Penitentiary for a period of 1 year."

December 16th, defendant filed motion for new trial.

On January 29, 1941, said motion coming on regularly for hearing, at the close of the arguments the court overruled the motion and pronounced judgment as follows:

"The Court: Mr. Dunbar, you were heretofore tried in this case, and the jury by their verdict found you guilty as charged in the information, found you guilty and fixed the punishment at one year. Do you have anything to say other than what your attorney has stated in your behalf why the court should not pronounce sentence at this time? The Defendant: No, sir. The Court: Under the jury's verdict, it becomes my duty to sentence you to a term of one year in the State Penitentiary at McAlester, Okla., at hard labor. Mr. Battenfield: To which judgment and sentence of the court, the defendant excepts. The Court: Let the record show that the defendant gives notice of his intention to appeal to the Criminal Court of Appeals of the State of Oklahoma and in the presence of the county attorney, the court clerk and the court, and for good cause shown the defendant is given 60 days in which to make and serve a case-made, the state is allowed ten days thereafter in which to present amendments, and five days time in which to serve and file the case-made and the court will fix the appeal bond at $1,000."

Briefly stated, the record discloses the following facts: That on the date alleged, complaining witness Henry was living with his wife and six children of tender years on a rented farm, about four miles northwest of Mazie. The defendant, Charles Dunbar, a married man, with his wife and son, was living on what is called the old Kennedy Ranch, and he was foreman of what is known as the Dunbar Ranch, owned by defendant's

brother, Ralph Dunbar, Sr., and his son Ralph, Jr. Henry left his home that forenoon, went to Mazie, and from there drove on to Pryor, and returned to Mazie about 3 o'clock that afternoon, parked his car, went in to the Neal Brother's Garage. Partitioned from the garage is their country store, and behind the service station is their repair shop.

The complaining witness, Henry, testified:

"O. L. Hutchins, Dwight Neal and Charles Dunbar were in the building, I spoke to Mr. Hutchins, and as I went out I asked Mr. Dunbar, the defendant, when Ralph Dunbar would be up, Ralph Dunbar was defendant brother's son, Ralph Dunbar, Sr., and Ralph, Jr., were running cows on what was known as the Kennedy land down there, Dunbar said he didn't know, then says: 'Oh, by the way, are you going to bring that wire home you got?' He says, furthermore, 'I don't believe you had a bit of right to get that wire,' I says, 'Ralph, Jr., gave me permission when I got the wire,' then he cussed me and said that Ralph, Jr., did not tell me to get the wire, I told him that he did. He brought up different things in profane language and accused me of stealing the wire that I had gotten from Ralph, Jr., he called me a damn liar, again and again. He called me everything but a gentleman. I said 'Come and go with me, I will prove it to you;' his car was right in front of the garage. He walked to his car and took a Winchester rifle from the car, and was loading it with shells out of a paper box, as I came up, he slipped a shell into the magazine, I was still facing him and he jerked down the lever, and when he pulled the lever back that way it cocked the gun, he was cussing me all the time, and just as he got the gun straight up from his hip to his shoulder I ran in through the garage, into the grocery department and turned to the right, as I started to run he said, 'Stop, you dirty son-of-a-bitch, or I will shoot you.' I didn't stop, but went on through the door into the grocery department and into the back room where the mechanics worked, I stooped down so he could not shoot me going

through there, as I went around the east end of the building he was at the northwest corner of the garage, I looked over my shoulder as he went around the corner of the icebox, with his rifle all the time aimed at me. I ducked down and ran around the corner of the Mayo house, out through the back lot, over the fence and over to the Katy depot and stayed there until I saw defendant drive away, then I went back to the store and got my car, I was not armed in any way."

Dwight Neal testified that he was at his place of business when the trouble occurred between these two men, that he saw Henry come back into the garage, and he was running, "moving right along," that he looked out and saw Dunbar standing by his car with a gun in his hands, but he could not understand what he was saying.

Dale Neal testified that he was not present "at the time the gun play was put into effect, but he saw Henry make his run through and around back of the garage, shortly afterwards he picked up a Winchester shell out there."

O. L. Hutchins testified that he was present when there was some difficulty between Dunbar and Henry, at the Neal store that day, and heard them talking about a wire fence or some wire, and they both went out of the garage.

He further testified as follows:

"Q. What was Dunbar doing with the gun at that time, at the time Henry was going to the back? A. He was going to the door as Henry went to the back. Q. How was he holding the gun? A. Holding the gun like this. (Indicating.) Q. Tell the jury whether or not the gun was pointed in the direction of Mr. Henry? A. Yes, sir, pointed that way when Henry went back. Q. Did you see Mr. Dunbar after Henry made his escape? A. Yes, sir. Q. What did he do? A. Well, he went to one end of

the garage and then the other. Q. What part of the building would that be? A. He went to the southwest corner and back to the northwest."

W. F. Nuckols testified that he is postmaster at Mazie, that with Mr. McNabb he was standing across the street from Neal Bros. Garage, and heard some loud talking over there across the street and saw the difficulty between these two men.

He further testified as follows:

"Q. Coming out of the garage. Didn't you observe either one of them continuing to walk after they got outside of the garage? A. Yes, sir. Q. Which one? A. Mr. Dunbar. Q. Tell the jury, please, sir, and the court, what you saw him do? A. I saw him go around there to the corner of his car, and I thought he was going to get in the car until he pulled out the gun. Q. Which door did he open? A. The back door on the west side. Q. And did he take anything out of the car? A. Just the gun, that's all I seen. Q. Uh, huh. What did he do with the gun? A. Well, he acted like he was loading it; I guess that was what he was doing. Q. Then after that tell the jury what he did. A. Well, he started talking to Floyd. Q. What position was he holding the gun in? A. He was raising it up. Q. Was the barrel pointing toward anybody, or anything? A. Yes, pointed out towards Floyd. Q. Towards Floyd Henry, the prosecuting witness in this case? A. Yes, sir. Q. What did Henry do, Mr. Nuckols? A. He taken out and left. Q. Do you know where he went? A. Yes, he went out of the door and around the building and across over to the depot."

Witness George McNabb's testimony was substantially the same as that of the witness Nuckols.

When the state rested, counsel for the defendant announced that he wished to present a motion, the jury was excused and counsel "moved the court to advise the jury to return a verdict of not guilty, for the reason that the evidence adduced on the part of the state is insufficient

to warrant a conviction under any theory that the state might adopt or elect to prosecute this defendant; first, on an attempt to kill; second, felonious assault, and third, pointing a gun, and the defendant at this time also renews his demurrer to the information along with defendant's objection to the introduction of any evidence upon the insufficiency of the information charging the crime of assault with intent to kill." At the conclusion of the argument the court announced: "I will overrule your motion." Defendant excepts.

Charles Dunbar, as a witness in his own behalf, testified:

"I was living a mile and a half west and a mile south of Mazie, on that part of the Dunbar ranch known as the Old Kennedy Ranch, I was foreman of the Dunbar ranch. It is about three-quarters of a mile from the north line of the ranch to Floyd Henry's house, I judge he had been living there about seven years. In the afternoon, about 2 or 3 o'clock I was at Neal's filling station, in Mazie, I parked my Chevrolet sedan near the south pump, about 20 feet from the door of the garage, went inside to pay Neal a bill I owed, I was there about 30 minutes talking to the Neal boys when Floyd Henry came in, I started out and was nearly to the door when Henry asked me where Ralph would be at, I told him I had seen him that day, and I said, 'By the way, Ralph said he told you to bring that wire back', and he says, 'All right, where do you want me to bring it, down where you live or at the ranch?' I said, 'To the ranch, where you got it.' The conversation was back and forth, both of us got pretty mad, each was using about as many cuss words as the other. As I went out he followed, and stood in the driveway, I went on to my car, we were talking, and the last thing he said was, I had accused him of stealing things at the ranch, then he said, 'You God-damn-son-of-a-bitch, I don't know whether I will ever bring that wire back or not.' I opened the car door and got the gun. He said, 'What do you say?' two or three times,

I loaded the gun, as the man testified, I got the shells in there, I walked back to the head of the car, and Mr. Henry turned and ran back through the building and went out back. I walked back to the southeast corner of the building and didn't see him and I walked back to the north line and looked around that way, where he started across the yard as he testified, I saw him there and he just ducked back, I did not see him any more. I turned and went back to the car, I got the Winchester out because I thought he was going to beat me up, or that he had a gun himself. Self-defense is the only reason I got it out of the car. I took the gun out and loaded it at the side of the car and walked to the front of the car. I had the gun in about the ordinary position, just like if you were going to shoot a bird, or something, and I never did raise it any higher than that. I did not make any attempt to shoot him."

He further testified as follows:

"Q. Now, you heard what Mr. Nuckols testified regarding you telling him to go back in the garage. A. Yes, sir. Q. State what was said there? A. When I went around the front of the car and Henry run I walked back to the west side of the car, as I turned around, and walked back, Mr. Nuckols was standing there and I said, thinking all the time Henry was still in there, I says, 'You gentlemen better get back inside, you might get hurt.' and they got back inside. Q. What kind of guns were in the station? A. A little old 22 pistol lying on the counter, and there was a 22 on the wall on the north end of the station. Q. Now, the witnesses have testified that you went on down north on the road about 100 yards, and then you stopped your car, is that true or not? A. That is true, I had started out to Grimmet Howsley's. Q. What did you stop your car for? A. Because I thought he was going to follow me, that was what I was looking for."

Ralph Dunbar, Jr., testified that his age was 25 years, was married, and that defendant is his uncle; that he looked after the Dunbar ranch when his father was

not around there; that they had one pasture across the section line towards where Floyd Henry lives; that he had a conversation with Henry last winter. He further testified:

"Q. Did you sell him any hog wire? A. Yes, sir. Q. Did he ask permission to borrow any wire from you? A. Not that I know of."

On cross-examination he stated:

"There was a roll of wire setting by the gate on the ranch, Henry asked to buy it, and I told him I could not sell it to him without seeing my dad," but that he did not remember when and where it was that Henry spoke to him about buying the wire.

The first assignment is: That the court erred in overruling the defendant's demurrer and other objections to the sufficiency of the information.

The grounds of the defendant's demurrer are: "That the said information does not contain sufficient facts to charge him with the crime of assault with intent to kill, or any other public offense." Overruled. Exceptions.

When the first state witness was called, the defendant objected to the introduction of any evidence "for the reason that the information herein is insufficient and does not charge a public offense." Overruled. Exception.

The sufficiency of the information was again challenged by motion in arrest of judgment.

The information is based on the first part of Penal Code, section 652, 21 O. S. 1941, providing as follows:

"Every person who intentionally and wrongfully shoots, shoots at, or attempts to shoot at another with any kind of firearm, airgun or other means whatever, with intent to kill any person * * * is punishable by imprisonment in the penitentiary not exceeding ten years. R. L. 1910, § 2336."

Our Code of Criminal Procedure provides, sec. 916, 22 O. S. 1941:

"The jury may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense." R. L. 1910, sec. 5923.

The instructions given by the court submitted the issue of assault with intent to kill as above defined, and submitted the included offense as defined by Penal Code, sec. 645, 21 O. S. 1941, providing as follows:

"Every person who, with intent to do bodily harm, and without justifiable or excusable cause commits any assault upon the person of another with any sharp or dangerous weapon, or who, without such cause, shoots or attempts to shoot at another, with any kind of firearm or air gun or other means whatever, with intent to injure any person, although without intent to kill such person or to commit any felony, is punishable by imprisonment in the penitentiary not exceeding five years, or by imprisonment in the county jail not exceeding one year." R. L. 1910, sec. 2344.

Also, submitted the issue of simple assault as defined by section 641, 21 O. S. 1941, which provides:

"An assault is any willful and unlawful attempt or offer with force or violence to do a corporal hurt to another." R. L. 1910, sec. 2340.

While there is some repetition and some surplusage in the information, it charges all the essential elements of the crime of assault with intent to kill, by attempting to shoot at another, and sufficiently alleges the attempt to shoot another.

An attempt to commit a crime consists of the following elements: First, the intent to commit the crime; second, the performance of some act toward its commission, commonly called the commission of some overt act;

third, the failure to complete or consummate the crime. 22 C. J. S., Criminal Law, § 75.

Otherwise stated, the intent and the overt act combined must fall short of the completed crime, in order to be an attempted crime.

It is also well settled that the overt act must be something more than mere preparation or planning the crime. It must be something done, some step taken beyond preparation, that directly moves toward the crime and brings the accused nearer to its commission than mere acts of preparation or of planning. It must be such act or acts as will apparently result, in the usual and natural course of events, if not hindered by extraneous causes, in the commission of the crime itself. State v. Thomason, 23 Okla. Cr. 104, 212 P. 1026; Becker v. State, 45 Okla. Cr. 350, 283 P. 796. By section 409, 22 O. S. 1941, sixth subdivision, Code of Criminal Procedure, the information is sufficient if it can be understood therefrom:

"That the act or omission charged as the offense is clearly and distinctly set forth in ordinary and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended."

In our opinion the allegations of the information are in compliance with the general principles above stated, and come within the requirements of the foregoing provision of our Code of Cr. Proc.

When the character of the firearm is designated, the manner of using it, and the person against whom the overt acts of assault and the attempt are directed, are alleged in plain English language, the acts charged as the offense are sufficiently pleaded, and the law requires no more.

The second assignment argued is: The court erred in not giving the jury an instruction on the offense of

pointing a gun, as defined by chapter 53, sec. 1279, 21 O. S. 1941.

It appears no request for instructions was made on the part of the defense, and that no such error is set forth in the motion for new trial. The record shows that this question is attempted to be raised for the first time in this court, and for this reason counsel for appellant has not properly raised the question.

Only prejudicial errors raised by exceptions reserved require a new trial, and it is only where we are satisfied that the verdict is contrary to law, or to the evidence, or that injustice has been done, that we are permitted to reverse a conviction whether or not an exception has been taken in the trial court.

The Code of Criminal Procedure provides the method of procedure for requesting instructions, and a defendant may submit to the court written instructions with the request that they be given, and how objections and exceptions shall be preserved. 22 O. S. 1941, §§ 831, 856.

It has been repeatedly held by this court that it is the duty of counsel for defendant, where he is of the opinion that additional instructions should be given, to reduce them to writing, and request that they be given. If he fails to do so, a conviction will not be reversed, unless the court is of the opinion, in the light of the entire record and instructions of the court, that there was a failure to instruct upon some material question of law, and that the defendant has been deprived of a substantial right. Green v. State, 70 Okla. Cr. 228, 105 P. 2d 795; Lee v. State, 67 Okla. Cr. 283, 94 P. 2d 5; Adams v. State, 62 Okla. Cr. 167, 70 P. 2d 821; Pulliam v. State, 61 Okla. Cr. 18, 65 P. 2d 426; Russell v. State, 17 Okla. Cr. 164, 194 P. 242; Williams v. State, 12 Okla. Cr. 39, 151 P. 900.

In the defendant's brief it is said:

"This court has repeatedly held that it is the mandatory duty of the trial court to give instructions submitting every included offense." Citing cases.

We have examined the cases cited and we fail to find that the offense of pointing a gun was ever held to be an included offense of a felonious assault.

The next assignment is that the court erred in giving instructions from 5 to 13, inclusive, which were excepted to.

It has been repeatedly held by this court that, where the instructions as a whole fairly cover the law of the case, and are not misleading, although some instructions may be inartificially drawn, the general charge will be held sufficiently comprehensive. We find the instructions given by the court, considered as a whole, fully and fairly cover the law of the case, and the instructions submitting the law of self-defense were more favorable to the defendant than the evidence demanded. It follows that the exceptions taken were wholly without merit.

It is also contended that the verdict rendered is too indefinite and uncertain, and for this reason the trial court was without jurisdiction to sentence the defendant to imprisonment in the penitentiary for one year on the verdict as rendered.

It appears no objection was made to the reception of the verdict. Nor do we find from the record that this question was ever raised in the trial court.

When considered in connection with the offense charged in the information, the instructions given by the court, and the punishment assessed, it is sufficiently definite and certain as to the offense of which the defendant was convicted.

This court has repeatedly said in numerous decisions that a verdict will not be held void for uncertainty if its meaning can be determined by reference to the record proper. Bowlegs v. State, 9 Okla. Cr. 69, 130 P. 824; Walker v. State, 11 Okla. Cr. 339, 127 P. 895; Simmons v. State, 15 Okla. Cr. 442, 177 P. 626; Coleman v. State, 16 Okla. Cr. 579, 194 P. 282; Pruitt v. State, 17 Okla. Cr. 434, 190 P. 894; Bard v. State, 23 Okla. Cr. 309, 214 P. 939; Gidens v. State, 31 Okla. Cr. 137, 236 P. 912; Nelson v. State, 34 Okla. Cr. 187, 245 P. 1009; Horton v. State, 44 Okla. Cr. 318, 280 P. 857; Bayne v. State, 72 Okla. Cr. 52, 112 P. 2d 1113.

The only defense interposed to justify the felonious assault was self-defense and the instructions covering the law of self-defense were more favorable to the defendant than the evidence demanded.

The instructions, considered as a whole, were full, fair and correct and covered all questions of law involved in the case. No others were requested by counsel who so ably represented the defendant.

It follows that the instructions of the court are not open to the objections urged against them.

Finally, it is insisted that the verdict is not sustained by the evidence.

Upon this question, it appears to us that the evidence on the part of the state, supplemented by the testimony of the defendant, is sufficient to sustain the verdict and judgment of conviction. Upon the defendant's own testimony he was not warranted in arming himself with a loaded Winchester firearm, and his conduct in making a felonious assault upon the complaining witness cannot be justified without doing violence to those well-settled rules and statutes which point the duty to one engaged in a difficulty to use only such force as reasonably ap-

pears to be necessary to prevent injury to himself at the time. Before one can justify a felonious assault with a deadly weapon, with intent to kill any person, or with intent to injure another, although without intent to kill such person, he must at least show that there were reasonable grounds for believing he apprehended imminent danger. It is elementary that one who seeks and brings on an affray cannot shield himself under a plea of self-defense.

The only controverted question of fact under the evidence was whether the defendant's intent was assault with intent to kill or assault with intent to inflict bodily injury, without intent to kill.

The complaining witness, the father of six children, the oldest not yet of teen age and a neighbor of the defendant, yet it would seem that the defendant was willing to engage in mutual mortal combat with his neighbor in a dispute over a spool of wire. The defendant admitted that after the complaining witness had run away from him, he got in his car, and instead of going south toward his home, went to the north edge of town, stopped his car on the highway, knowing that he would be likely to again come in contact with the complaining witness. In fact, it appears the defendant made no effort to avoid what he himself testified might be a deadly encounter.

How appropriate the words of Solomon: "A fool's mouth is his destruction, and his lips are the ruin of his soul." Prov. 18:7.

Carefully considering the whole testimony, we feel constrained to say that there is not a single extenuating feature in this case. On the contrary, the defendant's entire conduct, from the beginning to the end, shows "a heart regardless of social duty and fatally bent on mischief."

Upon consideration of the entire record, we are clearly of the opinion that no error was committed by the trial court prejudicial to the substantial rights of the defendant.

In our view the verdict of the jury in assessing the punishment of the defendant at imprisonment for one year in the penitentiary is, upon the undisputed facts and circumstances as shown by the evidence, exceedingly lenient.

Upon the whole case it appears that the defendant had a fair trial, and that the ends of justice, under the law, were no more than satisfied by the judgment of conviction appealed from.

The judgment of the district court of Mayes county herein is accordingly affirmed.

BAREFOOT, P. J., and JONES, J., concur.