Helen FOSTER, Administratrix of the Estate of James Anthony Foster, a Deceased Minor Child, Plaintiff in Error,

v.

Sampson EMERY, Defendant in Error.

No. 43481.

Supreme Court of Oklahoma.

March 14, 1972.

McConnell & Rice, Oklahoma City, for plaintiff in error.

Jake Hunt, Hunt & Thomas, Oklahoma City, for defendant in error.

JACKSON, Justice:

This action was brought for damages for the wrongful death of a 15-year old boy, James Anthony Foster, by his mother, Helen Foster, as administratrix of his estate. After verdict and judgment for defendant, Sampson Emery, plaintiff appeals.

In her brief on appeal plaintiff questions the sufficiency of the evidence to take the case to the jury, and the refusal to give certain requested instructions. We will summarize the evidence before discussing the arguments presented.

It is agreed that plaintiff's decedent, to whom we shall refer as James, was killed by a shot fired by defendant with a pistol; it is further agreed that the shooting happened after an "incident" at defendant's home on Sunday night, June 4th, about 10 o'clock P.M. There is no suggestion in the pleadings that defendant actually intended to kill James, or to shoot him, and the record shows that no criminal charges were filed against him. Defendant's conduct was described in the pleadings as wrongful, unlawful, negligent and careless, but not as willful.

As to the details of what happened, the evidence is in conflict. There were material conflicts between the account given by defendant to police at the scene a few minutes after the shooting, his later testimony on deposition, and the oral testimony he gave at the trial. There were similar material conflicts between a statement given to the police the day after the shooting by M, plaintiff's principal witness, a 16-year old boy who was with James, and the oral testimony of M given at the trial. The conflicts were fully and completely exposed to the jury. The resolution of such conflicts, and the question of the credibility of witnesses, are of course matters peculiarly for jury determination. Since by their general verdict the jury resolved these conflicts in defendant's favor, all conflicts have been resolved in defendant's favor in the following summary.

Defendant, for many years a science instructor in the Oklahoma City Public Schools, lived with his wife and three daughters in a residential section of Oklahoma City. The daughters were 18, 15 and 13 years of age. To earn extra money defendant worked five nights a week, from 6:30 P.M. to 9:30 P.M., instructing in a private institution. For this reason he was not at home with his wife and daughters during those hours on week nights.

Beginning about a month before the shooting, defendant's family was bothered by prowlers and window-peeping incidents. On one occasion the intruder spoke to the 15-year old daughter through the partially open bathroom window, and she ran frightened into her parents' bedroom. What the intruder actually said to the daughter on that occasion was not permitted to go to the jury. On another occasion, the defendant found two "gallon cans" against the wall under the window. The first incident happened early in May, and although the intruder had fled when defendant got outside, he fired some shots into the air "to scare the man away so he wouldn't come back". The last prior incident had happened the night before the shooting of James. Defendant testified that he was nervous and scared "about a man being around my house".

On Sunday night, June 4th, a little after 10 o'clock P.M., defendant was in the den of his home watching television, when he heard his dog barking and "cutting up". After telling his wife to call the police he took his pistol and went outside. He saw someone standing at a bedroom window, "facing the window and close to the window". Defendant shouted "hey" and the intruder ran through a hedge between defendant's premises and the house next door, out of defendant's field of vision. Defendant fired his gun two or three times "in the air". He brought his arm "up like this" and finally agreed on cross examination that the gun "might have been at any angle" while he was firing. Defendant went back into the house and asked his wife if she had called the police; she told him she had. He went back outside and saw someone "bending over" in the back

yard of the house next door. It was James who died of the effects of a gun shot wound later that evening in a hospital.

Two police officers responded to the call reporting the prowler. While they were on their way to defendant's residence, they were notified, via radio, that a shooting incident had occurred there. When they arrived about 12 minutes after the first call, they found defendant "extremely distraught", "lying prostrate in the front yard", and "from a layman's point of view in shock". Their conversation with him, upon which a part of their report was based, was "rather sketchy because of his condition". Defendant spent nine days in the hospital after the shooting incident.

The officers also talked with James, who was still alive and conscious, but the details of the conversation were not permitted to go to the jury.

On the night of the shooting, M and James had been watching television in James' home about a block from defendant's residence. Late in the evening M decided to go home, and James accompanied him part of the way "so they could talk". They took a short-cut through a back alley and some of the back yards, going in the general direction of defendant's home. They stopped at an apple tree and pulled and ate some apples. James started to "pulling" at M to go. He wanted M to go with him "over to Mr. Emery's" "so they could peep in the window". M refused to do so; James then left and "walked toward the Emery home". Shortly thereafter M heard some shots and "panicked and ran".

In his instructions to the jury, the trial judge defined the term "trespasser" and told the jury that as against a trespasser, a land owner must refrain "from intentional harm, from willful and wanton injury". There was no objection to this instruction, and it is not questioned in the briefs. For this reason, we think it may have escaped the attention of the Court of Appeals. Most of the rest of the instructions were those ordinarily given in a negligence action.

In her first proposition on appeal, plaintiff argues that the court erred in failing to direct a verdict for plaintiff at the close of all of the evidence.

We are unable to agree. We have noted that there were conflicts in the evidence requiring jury determination. Also, the court's instructions in effect left to the jury the question of whether plaintiff's decedent occupied the status of one to whom defendant owed an affirmative duty to exercise ordinary care, or was a trespasser, to whom the duty was only to refrain from intentional, willful or wanton injury. We think the evidence justifies a jury conclusion that James was a trespasser, and that the applicable test of defendant's liability was whether his conduct amounted to intentional harm or willful or wanton injury.

As we have seen, there was no allegation or evidence that defendant actually intended to shoot or kill James, or anyone else. The precise issue thus becomes whether defendant was guilty of "wantonness" or "wanton conduct" proximately causing James' death.

It is said that strictly speaking, wantonness and negligence are mutually exclusive and incompatible terms, 57 Am.Jur.2d Negligence, Sec. 103, and that mere carelessness or inadvertence may constitute negligence whereas wantonness is essentially a state of mind, 65 C.J.S. Negligence § 9(1)(b). Nevertheless, wanton conduct is so inextricably connected or interwoven with the law of negligence as to be incapable of separate treatment as a distinct tort. 57 Am.Jur.2d Negligence, Sec. 103.

Wanton conduct has been said to be such conduct as exhibits a conscious indifference to consequences in circumstances where probability of harm to another within the circumference of the conduct is reasonably apparent, although harm to another is not intended, but only that the act is so unreasonable and dangerous that the actor either knows or should know

that there is an *eminent likelihood* of harm. It has also been described as conduct which manifests a disposition to perversity, and it must be under such surrounding circumstances and conditions that the actor must know that *it will in all common probability* result in injury. The existence of a *high degree of likelihood* that substantial harm will result is an essential ingredient of wanton and reckless conduct. 57 Am.Jur.2d Negligence, Sec. 102. To the same general effect, see 65 C.J.S. Negligence § 9(2) (b).

■ As a practical matter, it may be said that it is rarely proper for the court, as opposed to the jury, to decide that a given course of conduct *does* amount to wantonness or wanton conduct. In the course of a lengthy, but not exhaustive, search, we have found only one case in which that was done. See Alabama Great S. R. Co. v. Louisville and N. R. Co., 5th Cir., 224 F.2d 1, 50 ALR 2d 1302. In that case, in reversing the trial court's determination, as a matter of law, that plaintiff railroad's employees had been guilty of wanton conduct, the U. S. Court of Appeals for the Fifth Circuit said in part:

"* * * generally speaking, * * * inherent in wanton negligence is the idea of moral fault, arising from, a consciousness that the act done or omitted to be done would probably cause serious injury, and the doing or failing to do, the act, despite such consciousness, with reckless indifference to consequences. In short, in such a case, 'The mental state of the person who did or omitted to do that which duty required in the premises * * * is a matter of controlling importance in cases of this character.'"

Although the issue upon which the appeal in that case was decided was the propriety of the trial court's action in granting summary judgment, the controlling question—whether there was a genuine issue of material fact—would have been substantially the same upon a motion for directed verdict.

We hold that the trial court did not err in overruling plaintiff's motion for directed verdict.

In her second proposition, plaintiff argues that the court erred in refusing to give her requested instruction number 5, which was in effect a definition of the word "assault" in language found in Tyner v. United States, (1909) 2 Okl.Cr. 689, 103 P. 1057, in which, plaintiff argues, the facts were "similar to the facts in the principal case".

■ The facts are similar only in that both cases involved the shooting of a boy. *Tyner* was a criminal case tried under the statutes of Indian Territory. The 11-year old victim in that case was not a trespasser; he was shot while he was "walking across his father's yard to the barn". The applicable statutory definition of assault (Sec. 905, Ind.T.Ann.St.1899, Mans.Dig., Sec. 1562) was substantially different from the one now in force in this state (21 O.S. 1971, Sec. 641), in that the Indian Territory definition omitted the element of willfulness. In cases tried under the Oklahoma statutes, our Court of Criminal Appeals has included the element of willfulness in its definition of assault, as required by statute. See, for instance, Dunbar v. State, 75 Okl.Cr. 275, 131 P.2d 116. Since there was no allegation or evidence that defendant willfully shot James the court properly refused to give the requested instruction. For the same reason, we hold that the court did not err in refusing to give plaintiff's requested instruction number 6, which would have told the jury that it is unlawful for one to carry a deadly weapon "with the intent or for the avowed purpose of injurying his fellowman".

Plaintiff's last proposition in her brief is that the court erred in failing to instruct, as a matter of law, that defendant's use of a firearm in this case was unreasonable.

■ Plaintiff did not request such an instruction. On the contrary, she asked the court to instruct, in effect, that ordi-

nary care in the firing of a gun requires the use of extreme caution while so doing. The court did give an instruction to that general effect (requiring a "very high degree of care"). Plaintiff's requested instruction amounted to an invitation to the court to submit the question of the reasonableness of defendant's resort to firearms to the jury. She may not now complain because the court did so. Madden v. Tilly, 175 Okl. 589, 54 P.2d 161; Bagley v. Blue Flame Propane Co., Okl., 418 P.2d 333.

In its opinion reversing the trial court's judgment in this case, the Court of Appeals discussed certain instructions of the trial court having to do with the law of self defense. No argument in that connection was made in plaintiff's brief. Plaintiff's failure to raise the question in her brief was undoubtedly due to the fact that she herself requested two instructions specifically mentioning, and dealing with aspects of, that subject.

We find it difficult, under the peculiar facts in this case, to separate the question of the reasonableness of defendant's resort to firearms from the question of the applicability of the law of self defense, since the same act—the firing of the pistol—is involved in both instances.

It is said that "The use of a firearm in defending against a simple trespass on land is almost universally condemned". 100 ALR 2d 1025. If this case involved a simple trespass on land and nothing more, there would be greater reason to hold that the instructions on self defense were reversible error. City of Shawnee v. Cheek, 41 Okl. 227, 137 P. 724.

However, it is also said in the same annotation that

"* * * A factual matter of significant importance is the precise interest invaded by the intruder and defended with the firearm."

▆ We think the evidence justifies a jury conclusion that the defendant in this case could reasonably fear more than a "simple trespass on land". He was the "nervous and scared" father of teen-age daughters who were at home without male protection five evenings a week. His curtilage had been invaded, and his family had been upset, by repeated incidents of prowling and window-peeping, including one by an intruder who addressed a remark of a frightening nature to the 15-year old daughter through the bathroom window. Defendant's "mental state" was a matter of controlling importance, and the question of the reasonableness of his resort to firearms, under all of the circumstances shown to exist, was properly for the jury in this case. Defendant was liable, not for a mere failure to exercise ordinary care, but only if, in view of his "mental state", his conduct was "so unreasonable and dangerous" as to charge him with knowledge that his acts would "in all common probability" result in injury.

Against this factual background, we cannot believe that the trial court's remarks concerning the law of self defense misled the jury, or that a different result would be reached in case of a re-trial. The instruction was generally in the terms of 21 O.S.1971, Sec. 643(3), with added language telling the jury that the right of self defense includes the right to defend the members of one's family. The court further instructed that the right to use force in defense of one's family was limited to such force as is "reasonably necessary", and he quite specifically instructed that such right "cannot prevail as a defense * * * by one who is himself the aggressor or by one who uses excessive force * * *". He also affirmatively directed the jury to return a verdict for plaintiff if they found, among other things, that the defendant "used an excessive amount of force in repelling the offense that he reasonably should have felt was imminent * * *".

After a careful consideration of the entire record before us, and considering the instructions as a whole and in connection

with the burden upon plaintiff to show wanton conduct, we do not believe the instructions on self defense were prejudicial.

The judgment of the trial court is affirmed.

BERRY, C. J., DAVISON, V. C. J., and WILLIAMS, IRWIN, LAVENDER and BARNES, JJ., concur.

HODGES and McINERNEY, JJ., concur in result.